**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

| | |
|---|---|
| A.H.,<br><br>    Plaintiff,<br><br><br>    v.<br><br><br>CARSON LOOP ESM, LLC *et al.*,<br><br>    Defendants. | CIVIL ACTION FILE NO:<br><br>4:24-cv-00224-WMR |

## **ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment. [Doc. 72]. After consideration, the Court denies Defendants' Motion.

## I.     BACKGROUND

When viewed in the light most favorable to Plaintiff, as the non-moving party, the facts are as follows:

This case stems from Plaintiff A.H.'s[1] alleged sex and labor trafficking at the Budgetel (hereinafter, the "motel") in Cartersville, GA from June of 2020 to June 29, 2021. *See generally* [Doc. 1]. Defendant Carson Loop ESM, LLC (d/b/a Budgetel) (hereinafter "Carson Loop") has owned the motel located at 35 Carson

---

[1] Plaintiff stated in her Complaint that "[g]iven the nature of the case, A.H. is identified . . . only by her initials to prevent public disclosure of her name." [Doc. 1 ¶ 1]. Plaintiff's counsel has disclosed Plaintiff's identity to defense counsel.

Loop NW, Cartersville, GA 30121 since 2016. [*Id*. ¶ 1]; [Doc 72-2 ¶ 2]. Defendant Srinivas Bollepalli (hereinafter, "Bollepalli") owned Carson Loop and, in turn, owned the motel. [Doc.72-2 ¶ 1]. In January 2020, Carson Loop hired Shreesh Tiwari to manage the motel. [*Id*. ¶ 9]; [Doc. 76-9, Bollepalli Dep. 24:6–14, 39:8–10] (hereinafter, "Bollepalli Dep."). At the time Carson Loop hired Tiwari, he moved into an apartment behind the motel office. [Bollepalli Dep. 24:6–8].

### A. Labor Trafficking Allegations

Plaintiff began working at the motel in June 2020. [Doc. 72-2 ¶ 18]; [Doc. 75-10 ¶ 16]. Plaintiff's job duties included housekeeping and construction related tasks. [Doc. 72-2 ¶ 19]; [Doc. 76-8, A.H. Dep. 42:3–21] (hereinafter, "A.H. Dep.").[2] Plaintiff, along with other employees, was required to live at the motel during employment. [Doc. 72-2 ¶¶ 25, 28]; [A.H. Dep. 87:13–18]. Plaintiff's room rate was deducted from her weekly pay. [A.H. Dep. 44:14–45:13]; [Doc. 75-2, Guilty Plea at 5]. Eventually, Plaintiff complained to Bollepalli that she was unhappy with her pay; subsequently, Bollepalli and Tiwari then raised Plaintiff's salary and room rate. [A.H. Dep. 37:15–38:2].

According to Bollepalli, he paid each employee through payroll checks which he signed. [Bollepalli Dep. 67:2–15]. However, the evidence reflects that Bollepalli

---

[2] The parties dispute as to whether Plaintiff's initial job tasks included actual construction or just cleaning in construction areas.

did not write any checks to Plaintiff. [Doc. 75-5] (all payroll checks produced, none written to Plaintiff). Rather, Tiwari paid Plaintiff money through the web application CashApp. [A.H. Dep. 37:10–25].

According to Tiwari's criminal guilty plea, Plaintiff worked seven days a week, from 9:00 A.M. to 5:00 P.M. each day. [Doc. 75-2 at 5]. At times "the Defendant required [Plaintiff] to work as late as 10:00 P.M." [*Id*.]. Plaintiff stated that both Tiwari and Bollepalli regularly "scream[ed] and yell[ed]" at her and other employees during work. [A.H. Dep. 24:6–19]. Plaintiff also claims that Tiwari "push[ed] her over" during work and threatened to fire and evict her, rendering her homeless, if she did not complete the work that Tiwari instructed her to complete. [*Id*. at 24:15–17, 40:23–41:6, 121:6–15].

### B. Sex Trafficking Allegations

Plaintiff stated that a few months after she began working at the motel, Tiwari began making sexual advances towards her. [*Id*. 203:8–204:3]. Plaintiff claims that Tiwari also threatened to fire her, evict her, call DFCS on her so that she would never receive custody of her child, and report her drug use to the police if she did not perform oral sex on him. [*Id*. 23:7–22, 67:16–68:21, 94:21–95:17]. Plaintiff also stated that during these encounters, Tiwari would "slam" her head down, "smack" her, and "push" her off him. [*Id*. 29:24–30:1, 66:25–67:20]. Additionally, Plaintiff

3

claims that Tiwari discouraged Plaintiff from associating with her friends and family and isolated her. [*Id*. 68:4–15, 96:4–14].

Further, Plaintiff claims that Tiwari entered her room without her permission and stole various important documents, including her ID, car title, insurance documents, and social security card. [*Id*. 26:17–24, 90:16–91:20, 95:25–96:7]. Tiwari stored these items in the motel safe in the office so Plaintiff could not access them. [*Id*.]; [Bollepalli Dep. 104:21–23, 113:4–25]; Tiwari also kept a gun in that office and regularly walked the property with a baseball bat. [*Id*. at 69:1–22, 70:24–71:2].

## C. Bollepalli's Role at the Motel

According to Special Agent James Rives,[3] Bollepalli went to the motel every other day and set the rules and overall operation of the motel. [Doc. 76-7, Rives Dep. 21:7–14] (hereinafter, "Rives Dep."); [Bollepalli Dep. 38:8–18, 39:5–7, 136:1]. However, Bollepalli did not spend the night at the motel. [Bollepalli Dep. 27:22–24]. Tiwari conducted day-to-day operations of the motel and followed Bollepalli's rules, policies, and procedures in doing so. [*Id*. 147:3–18]. However, Bollepalli retained control over large decisions, such as hiring and firing employees. [*Id*.].

---

[3] Special Agent Rives works as a Special Agent at the Department of Homeland Security and investigated Tiwari's crimes. [*Id*. 8:21–9:15, 12:1–25].

Additionally, Plaintiff never directly complained to Bollepalli about Tiwari's alleged actions which Plaintiff states amount to labor or sex trafficking. [*Id.* 133:18–22].

Bollepalli also had access to the motel safe and Tiwari's computers which Tiwari used to document his trafficking. [Bollepalli Dep. 119:21–120:10]. Those computers contained photographs and videos of victims performing oral sex on Tiwari, screenshots of sexually suggestive texts messages between Tiwari and a victim, photographs of several trafficking victims, and payroll files, among other evidence that was readily available to Defendants. [Doc. 76-4, DHS Report ROI DG15HR21DG0002-053].

Bollepalli regularly requested police reports on criminal activity at the motel. [Bollepalli Dep. 30:8–17]. Bollepalli also read Google reviews about the motel once a month. [*Id.* 121:4–21]. Those reviews included the following allegations: that the motel was reportedly "not clean, and drug infested," "disgusting… [a]lmost everyone is a drug addict," "[t]he people here are bad people and a big problem with drugs," "drug addicts and prostitutes," "[i]t looked like a cross between a crack house and a no-tell motel," "too much drug activity & just didn't feel safe sitting there," "[m]en coming and going in the room next to ours, all night," "knife mark's in the wall," "people fighting in the parking lot," "[t]his is the scariest place I've ever stayed!," and "if you need DRUG'S Budgetel is the place to go oh hell forgot the most important things WHORE'S -Homewreakin Female's and Male's all over the

5

place." [Doc. 75-7, Google Reviews]. Additionally, Bollepalli is quoted in an article which details the crime ridden nature of the motel. [Doc. 75-6] (containing a news article with quotes from Bollepalli in which the motel is described as "one of the most crime-ridden areas in the county").

Reportedly, due to drug activity, Defendants instituted some security measures. [Rives Dep. 21:11–14]. Specifically, in an interview with Special Agent Rives, Bollepalli stated that he started a 10:00 P.M. curfew at the motel because of its known drug activity. [*Id.*]. Additionally, Bollepalli stated that the motel had surveillance cameras and locked the lobby at night. [Bollepalli Dep. 65:16–21, 46:18–25].

### D. Human Trafficking Notice

Beginning in 2013, motels were required to post a human trafficking notice "in a conspicuous place near the public entrance of the business or establishment or in another conspicuous location in clear view of the public and employees." O.C.G.A. § 16-5-47(b). Bollepalli stated that he does not know if such a notice was ever posted at the motel. [Bollepalli Dep. 74:1–25]. The parties dispute as to whether the notice was visible to all employees or just management.

On June 29, 2021, the Department of Homeland Security raided the motel. [*Id.* 114:13– 17]. That same day, Bollepalli terminated his business relationship with

6

Tiwari. [*Id*. 116:3–16]. On June 1, 2023, Tiwari entered a guilty plea to labor trafficking. [Doc. 75-2].

## II.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is proper when the record evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if evidence suggests a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted). The moving party bears the burden of demonstrating that there is no genuine issue of material fact that should be decided at trial. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The Court views the evidence and any inferences that may be reasonably drawn in the light most favorable to the non-movant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970).

## III. DISCUSSION

### A. Plaintiff's Claims for Sex and Labor Trafficking Pursuant to 18 U.S.C. § 1595

First, Plaintiff asserts claims for both labor and sex trafficking. [Doc. 1 at 24, 27]. Defendants argue that there is no evidence from which a jury could reasonably conclude that Plaintiff was a victim of sex or labor trafficking; therefore, they argue that the Trafficking Victims Protection Reauthorization Act (hereinafter, the "TVPRA") does not apply to her. [Doc. 72-1 at 10].

"The TVPRA, 18 U.S.C. § 1591, criminalizes various acts involved in the sex [or labor] trafficking of minors or adults by force, fraud, or coercion." *A.G. v. Northbrook Indus. Inc.*, 171 F.4th 1257, 1267 (11th Cir. 2026). That same statute "also criminalizes the act of knowingly benefiting from and knowingly assisting, supporting, or facilitating sex [or labor] trafficking." *Id*. (citing 18 U.S.C. § 1519(a), (e)(4)). Congress created "a civil cause of action by which trafficking victims may sue 'perpetrator[s]' in federal court for damages." *Id*. (citation omitted). Congress then expanded the cause of action in § 1595, which provides:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees

*See id*. (citing 18 U.S.C. § 1595(a) (2022)).

8

There are four elements that a plaintiff must prove to impose civil liability under § 1595(a), which are that the defendant: "(1) knowingly benefited (2) from participating in a venture; (3) that the venture violated TVPRA as to the [plaintiff]; and (4) the franchisor knew or should have known that the venture violated the TVRPA as to the [Plaintiff]." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 723 (11th Cir. 2021).

### 1. Sex Trafficking

The TVPRA attaches liability to beneficiary claims where a defendant:

> [K]nowingly . . . in or affecting interstate or foreign commerce recruits, entices harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or benefits, financially or by receiving anything of value, from participation in a venture which has engaged in [an act described above], knowing, or (. . .) in reckless disregard of the fact, that means of force, threats of force, fraud, [or] coercion... will be used to cause the person to engage in a commercial sex act.

18 U.S.C. § 1591(a). A "commercial sex act" is defined as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1595(e)(3).

Defendants argue that nothing of value was exchanged for the sex acts in question; therefore, they claim that the sex acts in this case do not amount of commercial sex. [Doc. 72-1 at 10] (stating that "there is no indication that Tiwari charged money or otherwise profited from his interactions with her[.]"). However, this argument fails.

As stated, under 18 U.S.C. §1591(e)(3), a commercial sex act is any sex act, on account of which anything of value is given to or received by any person." Despite Defendants' contentions, a thing of value does not have to be money. *United States v. Nilisen*, 967 F.2d 539, 542–43 (11th Cir. 1992) ("Congress' frequent use of 'thing of value' in various criminal statutes has evolved the phrase into a term of art which the courts generally construe to envelope both tangibles and intangibles. This broad interpretation is based upon a recognition that monetary worth is not the sole measure of value.").

Plaintiff presented evidence which illustrates that Tiwari threatened to fire and evict Plaintiff if she did not comply with his demands for sex, and that he would report her to the police and DFCS. [A.H. Dep. 24:6–17; 40:23–41:6, 121:6–15]. These facts could lead a jury to reasonably find that having a place to live, continued employment, custody of her child, and remaining out of jail are all "things of value" to Plaintiff such that she could be a victim of sex trafficking under the TVPRA.

## 2. Labor Trafficking

Under the TVPRA, labor trafficking occurs when a person "knowingly provides or obtains the labor or services" of another person:

> (1)   by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> (2)   by means of serious harm or threats of serious harm to that person or another person;
> (3)   by means of the abuse or threatened abuse of law or legal process; or

10

> (4)    by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a).

A jury could also conclude that Plaintiff's labor was obtained by force, threats of force, threats of serious harm, and threats of legal process. Specifically, Plaintiff testified that Tiwari and Bollepalli regularly yelled at her, that Tiwari pushed her, and threatened to fire her, evict her, report her to the police, and report her to DFCS. [A.H. Dep. 24:6–17; 40:23–41:6, 121:6–15, 24:15-17]. Additionally, Plaintiff claims that Tiwari, in his position as manager, entered Plaintiff's room without permission to steal her property. [*Id*. 26:17–24, 90:16–91:20, 95:24–96:7]. Tiwari then kept those things in the motel safe so that she could not leave the motel. [*Id*.]. A jury could reasonably conclude that any, or all, of those actions constitute force, threats of serious harm, and threatened abuse of law or legal process to obtain Plaintiff's labor, thus making her a victim of violation of the TVPRA.[4]

### 3.  TVPRA Elements

Having determined that there are facts from which a jury could conclude that Plaintiff was "a victim of a violation of this chapter," the Court now turns to the four elements of a TVRPA claim, as articulated by the Eleventh Circuit in *Red Roof Inns,*

---

[4] A jury could also conclude, contrary to Defendants' contentions, that Defendants "obtained" Plaintiff's labor each day that she worked at the Budgetel for a year.

11

*Inc.*, 21 F.4th at 714 and further clarified in *A.G.*, 171 F.4th at 1268. Plaintiff has presented sufficient facts for a jury's consideration as to each element.

### a. *Knowingly Benefitted*

The first element of a TVPRA beneficiary claim is that the defendant "knowingly benefitted" from participating in a common undertaking. *Red Roof Inns, Inc.*, 21 F.4th at 724. Defendants admit that Plaintiff worked at the motel. Additionally, there is evidence that Plaintiff worked for up to twelve hours per day, seven days a week.

It is undisputed that Plaintiff paid rent to Defendants. [Doc. 75-2]. There is also evidence that could lead a jury to find that Defendants retained that rent. Therefore, from these facts, a jury could reasonably conclude that Defendants knowingly benefited from Plaintiff's labor and room rent, thereby satisfying the first element of the TVPRA.

### b. *Common Undertaking or Enterprise*

The second element is that a defendant must partake in the knowing benefit from "[taking] part in a common undertaking or enterprise involving risk and potential profit." *A.G.*, 171 F.4th at 1268 (quoting *Red Roof Inns, Inc.*, 21 F.4th at 725).

In *A.G.*, the Eleventh Circuit clarified that "[t]o be liable under § 1595, defendants must take part in a common enterprise to the extent that they share legal

12

risks and potential profits with traffickers." *Id*. However, "nothing in the plain language of § 1595(a) requires that the 'venture' be a 'trafficking venture.'" *Id*. at 1269.

The facts show that Plaintiff's trafficker (Tiwari) was an employee and manager of Defendants (Bollepalli and Carson Loop). [Bollepalli Dep. 24:6–14; 39:8–10; 81:2–13; 146:10–23]. Tiwari worked with Defendants to operate the motel, shared legal risks, and shared profits. [*Id*.]. Tiwari acted in the Defendants' direction and was empowered by Defendants to evict people from the motel. [*Id*.].

Additionally, as stated, Plaintiff has presented testimony that Tiwari and Bollepalli both screamed at her, and that Tiwari physically pushed her. These facts are sufficient for a jury to find that Tiwari and Defendants took part in a common enterprise, sharing legal risks and profits.

### c. The Undertaking Violated the TVPRA

The third element requires that there are facts from which a jury could conclude that the undertaking of the enterprise violated the TVPRA as to Plaintiff. *Id*. at 1268. Agent Rives testified that his investigation showed that Tiwari forced Plaintiff to work long hours for no pay and engage in sex acts with him as the manager of the motel. [Rives Dep. 29:20–25, 30:1–25]. Agent Rives also determined, during his investigation, that Tiwari's job as the manager of the motel is what put him in a position to traffic Plaintiff for sex and labor. [*Id*. 31:7–11].

Plaintiff's trafficker also pled guilty to her trafficking at the motel, which means he agreed that the United States could prove beyond a reasonable doubt that his actions violated the TVPRA. Therefore, summary judgment on this element is improper.

### d.  Defendants' Knowledge

Finally, there must be facts from which a jury could reasonably conclude that Defendant had knowledge, either constructive or actual, that the undertaking or enterprise violated the TVPRA. *Red Roof Inns*, 21 F.4th at 725. This means knowledge that Defendants "knew or should have known of the" larger "trafficking venture" which victimized Plaintiff. *J.G. v. Northbrook Indus. Inc.*, 619 F. Supp. 3d 1228, 1239 (N.D. Ga. 2022). Therefore, Plaintiff must demonstrate facts which could lead a jury to conclude that Defendants had actual or constructive knowledge about the trafficking venture and the facts that suggest that Plaintiff was a victim of that venture. Plaintiff has satisfied TVPRA's knowledge requirement.

The Court finds such facts here, including the fact that Bollepalli may have had actual knowledge of the trafficking enterprise when he wrote payroll checks to all employees, but never wrote a check to Plaintiff. [Doc. 75-5]. Bollepalli also allegedly partook in verbal abuse and witnessed Tiwari's physical abuse of Plaintiff. [A.H. Dep. 24:6–19]. Additionally, Tiwari, as Defendants' employee and agent, also threatened to evict Plaintiff and call DFCS on her. [A.H. Dep. 24:6–17; 40:23–41:6, 121:6–15].

14

Finally, Bollepalli admits that he had access to the motel's computers, where Tiwari documented his trafficking efforts. [Bollepalli Dep. 104:21–23, 113:4–25; 119:21–120:10]; [A.H. Dep. 26:17–24; 90:16–91:20; 95:24–96:7]. Plaintiff presented testimony that the motel computers contained photographs and videos of victims performing oral sex on Tiwari, screenshots of sexually suggestive texts messages between Tiwari and a victim, photographs of several trafficking victims, and payroll files, among other evidence, that provides actual or constructive knowledge of TVPRA violations by Defendants. [*Id.* 23:7–22].

## B. Plaintiff's State Law Negligence Claims

### 1. Failure to Warn/Premises Liability O.C.G.A. § 51-3-1

"[T]o recover on a premises liability claim, a plaintiff must show (1) that the defendant had actual or constructive knowledge of the hazard; and (2) that the plaintiff lacked knowledge of the hazard despite the exercise of ordinary care due to actions or conditions within the control of the owner/occupier." *D'Elia v. Phillips Edison & Co. Ltd.*, 354 Ga. App. 696, 698 (2020) (citation omitted); O.C.G.A. § 51-3-1. If Defendants had no actual or constructive knowledge of the various hazardous conditions, they are entitled to summary judgment. *See Am. Multi-Cinema, Inc. v. Brown*, 285 Ga. 442, 444 (2009) (stating that at summary judgment, a plaintiff must show that evidence exists which shows that the defendant had actual or constructive knowledge of the hazard) (citation omitted).

15

Under Georgia law, a plaintiff can show a premise owner's constructive knowledge of a hazard by showing "evidence that the hazardous condition lasted so long that it would have been discovered and removed if the proprietor had exercised reasonable care in inspecting the premises." *River Place at Port Royal Condo. Ass'n v. Sapp*, 358 Ga. App. 632, 636 (2021) (citation omitted); *Mullinax v. Pilgrim's Pride Corp.*, 354 Ga. App. 186, 196 (2020). Notably, "[i]f the proprietor has reason to anticipate a criminal act, he or she then has a 'duty to exercise ordinary care to guard against injury from dangerous characters.'" *Wade v. Findlay Mgmt., Inc.*, 253 Ga. App. 688, 689 (2002). Reasonable or "[o]rdinary care is that degree of care which is exercised by ordinarily prudent persons under the same or similar circumstances." *Mullinax*, 354 Ga. App. at 191–92. Defendants are generally insulated from liability for injuries caused by a third-party's intervening criminal conduct, unless they had sufficient reason to anticipate the criminal conduct. *Georgia CVS Pharmacy, LLC v. Carmichael*, 316 Ga. 718, 720–21 (2023).

Plaintiff asserts that Defendants are liable for general premises liability through the following alleged inactions: (1) failing to provide adequate lighting and security; (2) failure to warn invitees of known hazards; (3) failure to keep the property safe; (4) failure to prevent and remove loiterers and trespassers; (5) failure to properly hire, train, and supervise employees; (6) general negligent security; and (7) failure to properly inspect and maintain the premises. [Doc. 1 at 21–22].

16

There is evidence that could lead a jury to conclude that Defendants knew of multiple other similar incidences of criminal acts. Those actions include prostitution, drug dealing, narcotics investigations, thefts, and sexual harassment. [Bollepalli Dep. 121:17–21] (including statements from Bollepalli that he reviewed reviews which include allegations of crime); [Doc. 75-7] (containing Google Reviews which include a variety of allegations including reports of drugs, prostitution); [Doc. 75-6] (containing a news article with quotes from Bollepalli in which the motel is described as "one of the most crime-ridden areas in the county.").

Additionally, there is evidence to show that Defendants knew that invitees reported these actions in online review. [Doc. 75-7] (Google Reviews). Defendants even allegedly instituted a 10:00 P.M. curfew and locked the overnight lobby, possibly since crime was foreseeable. [Doc. 76-2, Rives Dep., 21:7–14]. These facts demonstrate a possibility that crime was potentially reasonably foreseeable to Defendants such that summary judgment is improper on these claims. Additionally, the adequacy of Defendants' security measures are questions of fact for the jury.

## 2.  Creating and Maintaining a Nuisance O.C.G.A. § 41-1-1

Under Georgia law, "a nuisance is anything that causes hurt, inconvenience, or damage to another and the fact that the act done[.]" O.C.G.A. § 41-1-1. However, "[t]he inconvenience complained of shall not be fanciful," rather, the inconvenience should be one which would impact a reasonable person. *Id*.

It is nuisance per se under Georgia law to "knowingly erect, establish, continue, maintain, use, own, or lease any building, structure, or place for the purposes of sexually related charges." O.C.G.A. § 41-3-1(b). Additionally, "the ground itself in or upon which such sexually related charges occurred or were conducted, permitted, carried on, continued, or shall exist, and the furniture, fixtures, and other contents of such building or structure shall be deemed to be a nuisance[.]" *Id*.

To establish a nuisance claim, a plaintiff must show "the existence of the nuisance complained of, that he or she has suffered injury, and that the injury complained of was caused by the alleged nuisance." *Bord v. Hillman*, 335 Ga. App. 18, 21 (2015) (citation omitted). The "essential element" of a nuisance claim is that defendant had "control over the cause of the harm." *Fielder v. Rice Const. Co.*, 239 Ga. App. 362, 366 (1999); *Grinold v. Farist*, 284 Ga. App. 120, 122 (2007) (same). Therefore, defendants "must be either the cause or a concurrent cause of the creation, continuance, or maintenance of the nuisance." *Sumitomo Corp. of Am. v. Deal*, 256 Ga. App. 703, 707 (2002). To show defendants have control, a plaintiff must allege "that the injury complained of was caused by some act or omission of the defendant[s], or that the conduct of the defendant[s] was the preponderating cause thereof." *Brimberry v. Savannah, F. & W. Ry. Co.*, 78 Ga. 641, 645 (1887).

18

There is evidence which could lead a jury to reasonably conclude that Defendants could be liable for per se nuisance. Specifically, Bollepalli testified that the motel was under his control and that Tiwari operated the motel at Bollepalli's direction. *See* [Bollepalli Dep. 24:6–14; 39:8–10; 81:2–13; 146:10–23]; [Doc. 75-1, Defendants' Responses to Requests for Admission, ¶¶ 23, 24]. Therefore, a jury could reasonably conclude that Defendants controlled the motel, the operation of which caused damage to Plaintiff. Plaintiff's nuisance claim also survives summary judgment.

### 3. Failure to Comply with Posting Notice O.C.G.A. § 16-5-47

Under O.C.G.A. § 16-5-47, certain businesses, including motels, must post a notice which provides information regarding the human trafficking hotline "in each public restroom" "and either in a conspicuous place near the public entrance of the business or establishment or in another conspicuous location in clear view of the public and employees[.]"

The parties dispute as to whether Defendants properly displayed the notice. *See* [Doc. 72-2 ¶ 6] ("The trafficking hotline notice . . . was posted at the Budgetel on a board in the lobby."); [Doc. 75-10 ¶ 58] ("If a human trafficking notice was ever posted at all, the notice was not posted where housekeeping staff, including Plaintiff, could see it."). Therefore, whether Defendants complied with the statute is

an issue properly left to the jury; accordingly, this claim survives summary judgment.

### C. Attorneys' Fees

Since there are sufficient facts for the jury to consider on Plaintiff's trafficking claim, Plaintiff's claims for attorneys' fees also survive. *See* 18 U.S.C. § 1595 (stating that a plaintiff in a TVPRA action "may recover damages and reasonable attorneys['] fees."). Additionally, there is sufficient evidence by which a jury could determine that Defendants' behavior rises to the level of willful misconduct sufficient for the imposition of punitive damages. Therefore, Plaintiff's claims for attorneys' fees and punitive damages also survive summary judgment.

## IV.   CONCLUSION

Accordingly, Defendants' Motion for Summary Judgment [Doc. 72] is **DENIED**.

**IT IS SO ORDERED** this 6th day of August, 2026.

WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE