# EXHIBIT 2

# SRINIVAS BOLLEPALLI

## Date: July 22, 2025

## Case: A.H. and S.T. vs Carson Loop ESM, LLC

METRO ATLANTA REPORTERS INC.

**Metro Atlanta Reporters, Inc.**
Phone: 770.985.2344
Fax:770.985.5044
Internet:metroatlantareporters.com

P R O C E E D I N G S

9:56 a.m.

(Whereupon, the court reporter complied with the requirements of O.C.G.A. 9-11-28(d).)

VIDEOGRAPHER: We are now on video record. The time is 9:56 a.m. The date is July 22, 2025.

Will the court reporter please swear in the witness.

(Witness sworn.)

MS. HOYING: This will be the deposition of Srinivas --

THE WITNESS: Srinivas Bollepalli.

MS. HOYING: -- Bollepalli taken pursuant to notice and agreement of counsel and for all purposes allowable under the Federal Rules of Civil Procedure. If it's agreeable, I propose that we reserve all objections, except for those as to the form of the question and the responsiveness of the answer, until the first use of the deposition.

MR. O'NEAL: It's agreeable.

MR. SWANSON: That's agreeable.

Whereupon,

SRINIVAS BOLLEPALLI

was called as a witness, was duly sworn and examined as follows:

at the Budgetel?
A. I'm not aware of that.
Q. Okay. If either the woman manager before Mr. Tiwari or Mr. Tiwari himself had called the police due to a safety or security concern, would you expect them to tell you that they did that?
A. Yeah.
Q. Okay. And did -- During your time owning the Budgetel do -- have you ever reached out to the police to ask them about safety and security concerns at the Budgetel?
A. Yes. Once in a while I go there and ask for how things are going in Budgetel, yes.
Q. Do you ask the police to give you police reports from incidents that happened there?
A. Yes.
Q. And you've done that since you've owned it?
A. Yes.
Q. How often do you go to the police and ask for police --
A. Once in a year.
Q. Once a year?
A. Yeah.
Q. Okay. So -- And has that been your practice at all times since you owned the Budgetel in 2016?
A. Yes.

Q. That you go to the police department and ask them for all the police reports from incidents that occurred at the Budgetel?
A. Yes.
Q. And have they always given them to you?
A. Yeah.
Q. Do you have a specific time of the year that you go do that, the first of the year?
A. Maybe end of the year. Maybe in December sometime.
Q. Okay. And when the police once a year gave -- gave you the police reports for the safety and security incidents that occur at the Budgetel, do you read them?
A. Yes, I do.
Q. So by the -- by the time that Mr. Tiwari was arrested in 2021, you had received and reviewed police reports in 2016, '17, '18, '19, and '20, yes?
A. Yeah.
Q. Is that the Bartow County Sheriff's Office?
A. Yeah.
Q. Or Bartow --
A. Bartow County.
Q. Bartow County Police Department?
A. Yeah.
Q. All right. The last bullet point on here, the last sort of big section on personal security, it says staff

A. Yes.
Q. And do you give work direction and instruction to all the employees that work there?
A. Not all of the employees. Usually the site manager, because I'm not there all the time, the site manager gives the instructions, the small jobs and all of that. If anything like critical decisions, and I take the critical decisions.
Q. Okay. And so are -- Is it -- Do you sort of set the rules for the --
A. Yes.
Q. -- for the hotel --
A. For hotel.
Q. -- and you tell what the site manager what those are going to be?
A. Yes.
Q. And the site manager is in charge of enforcing those things?
A. Enforcing them.
Q. Okay. Same with the number of employees, you decide how many housekeepers you need and maintenance folks you need, and the site manager is in charge with managing them day to day?
A. Yes.
Q. How about same thing for staff salaries? Do you set the staff salaries, and the site manager tells you if he

too.

A. Let me see. I need to wear my glasses.

Q. Okay. You can't -- You can't see her face in the second photo of Exhibit 2, but the third photo of Exhibit 2, which was taken from a screenshot the next day, April 17, you can see her from the side. Do you know who that young lady is in the second and third photos?

A. I can recognize this lady.

Q. Okay. We will get to that lady.

A. But I don't -- I can't recognize this lady.

Q. Okay, that's fine. In the third photograph -- You told me in the second photograph, it's you and Mr. Tiwari, and then the young lady behind the desk that we can't identify. The third photograph is you behind the desk talking to somebody? Is that a guest?

A. Yeah, it's a guest.

Q. Okay. And then we see that young lady again, and then a man in a mask. Do you know who the man in the mask?

A. Yeah, he's my friend. This is the friend we together bought the Best Western. His name is Jalandhra Jabhav.

Q. Okay. And did Mr. Jabhav, did he ever have any ownership or management role in the Budgetel?

A. No, never.

Q. Okay. And that's you?

A. That's me, yes. I don't remember what -- who this girl is. I can't. Even that person who is on there, I don't recognize that person also, this person.
Q. Oh, the man in the hat on the other side of the glass?
A. Yeah.
Q. Since he's on the other side of the glass there, I guess I just assumed that he was a customer. Do you know?
A. Maybe a customer.
Q. Okay. All right. And then the next page, which is the fourth page of Exhibit 2, we see Mr. Tiwari again, yes?
A. Yeah, this is Mr. Tiwari.
Q. Okay. And then you just told me you do recognize the young lady in the chair?
A. Yes.
Q. And who is that?
A. Her name is April Lipscomb.
Q. Oh, okay. Does she still work for you?
A. No.
Q. Did she last work for you when the raid happened?
A. Yes.
Q. And she hasn't been back since then?
A. No.
Q. Okay. Is that correct?
A. Yes.

Q. And when I say when the raid happened, we're talking about the June 29th.

A. 29th, yes.

Q. Okay. All right. And then flip to page five, there's a housekeeper, a young lady. Do you recognize that young lady?

A. I can't. Yeah, I can't recognize her unless I see her.

Q. Okay. But from looking at this photograph, you don't know who that is?

A. No.

Q. Okay. And then the last photograph in Exhibit 2, there's a lady with red hair sitting in the sofa. Do you know who that is?

A. No, I don't recognize either.

Q. Okay. In the last picture of Exhibit 5(sic), the one you're on, is this the lobby of the Budgetel?

A. Lobby, yes.

Q. Okay. And is it also the site manager's living room?

A. No, the living room -- The apartment is inside.

Q. Okay. Got it.

A. Yeah, this is just the lobby.

Q. Okay. And then the there's a gray door in the middle of the photograph.

A. Yeah, this one --
Q. It has an exit sign over the top?
A. Yeah, exits out to the other buildings.
Q. Okay. And so if I go through that gray door with the exit sign over the top, I go outside?
A. Outside to the L-shaped building.
Q. Okay. And then there's two double doors just to the right of that exit gray door between the exit gray door and the refrigerator?
A. Yeah, that's a hall.
Q. Okay. Just a hallway?
A. Yeah, hall.
Q. Okay. And then the two double doors with the windows on the front of that photograph, where do those go?
A. This is also -- This side -- There's two halls in there.
Q. Okay. Is that the storage area back there?
A. Yeah, storage area back there.
Q. And the on-site manager's apartment is sort of behind the mirror that we see?
A. Yes, that's right.
Q. Got it. Okay. You can put that aside.
MR. SWANSON: Thinking about a comfort break.
MS. HOYING: Oh, sure.
MR. SWANSON: Good stopping point. It's been

A. Public Health, yes.
(Whereupon, Plaintiffs Exhibit No. 3
was marked for identification.)
BY MS. HOYING: (Resuming)
Q. I will mark that as Exhibit 3. Is this Exhibit 3, is this what you received when the Department of Public Health shut y'all all down in October of 2019?
A. Yes.
Q. Okay. And in some of the news articles I have read about this shutdown, you had been working with the Department of Public Health for about a year before the shutdown to improve things at the hotel, correct?
MR. O'NEAL: Object to the form.
BY MS. HOYING: (Resuming)
Q. Yeah?
A. I don't think anything like that working with them or anything.
Q. Okay.
(Whereupon, Plaintiffs Exhibit No. 4
was marked for identification.)
BY MS. HOYING: (Resuming)
Q. Let me hand you what I just marked as Exhibit 4, which is a news article about that October of 2019 shutdown. It's never my intention to ask you questions about a document before you've had a chance to read it. So why don't you go

ahead and take a -- take a minute and read it.

A. (Whereupon, witness reads document.)

Q. Are you ready?

A. Yes.

Q. All right. Mr. Bollepalli, so Exhibit 4 is a news article titled, Families Face Uncertain Future Following Mass Motel Eviction, and you gave an interview to the reporter for this article, correct?

A. I don't -- I don't remember.

Q. Okay. You're quoted in here on page two. It looks like perhaps just page two. Do you remember telling the reporter that you've been working, and Bartow County were giving -- was giving you instructions on how to bring the hotel up to code?

A. Time to time, we -- the county officials come and check, and we improve on the property.

Q. Okay. And you had told, I guess the reporter, that you had already invested about $500,000 in making improvements; does that sound right?

A. I'm not sure that. I don't remember.

Q. Okay. Were you surprised when the Department of Public Health shut you all down in October 2019?

A. Yes.

Q. Okay. Had they given you any warning that they were coming?

and collect police reports, did any police officer ever tell you that there was crime problems at the property?
A. They never said that. There were a lot of calls, and they were all false calls. That's what I heard.
Q. Okay.
A. The 911 calls, sometimes what they do is, the microwave broke, they just call 911. The toilet doesn't work, they call 911. That's how they build up all these calls.
Q. I see.
A. Most -- Ninety percent of those calls, what I've seen from the report, was like false calls.
Q. Okay. And so when you would go and receive the reports, and they would give you a stack of reports, and you reviewed them every year, there weren't things in there that caused you security concerns?
A. No.
Q. Because most of the calls, the vast majority, ninety percent were false?
A. False, yes.
Q. Okay. And so when it talks about in here drug activity, selling drugs, prostitution, those kinds of things, you didn't see those in the reports that you reviewed?
A. No.
Q. And you reviewed all the reports for the hotel?
A. Yes.

Q. Okay. And what -- what do you have that will tell us who worked there in 2020 and 2021?

A. Yeah, most of the these paper, like we have like hard copies of all the employees that -- that worked. They have to submit a - what is it - clock-in/clock-out kind of papers. When they raided the place, they took everything. Right now, what we have is on the computer. My accountant, he issues weekly pay stubs and W2 forms. So we have all the records on the computer. That's all we have. And other hard copies and all that, we kept it in the office. When they raided, they took everything, and they never returned to us.

Q. Okay. And so what you have, you said you have pay stubs where folks clock-in and clock-out?

A. Yes.

Q. And so you've got documentation, for example, for Ms. H. that shows every day what time she started work and what time she ended work?

A. Yes.

Q. And is -- are -- Is that the documentation that you used to determine how much to pay her?

A. Yes.

Q. Okay. Are all of your housekeepers in 2020 and 2021 were they paid hourly?

A. Hourly.

Q. And when we sent discovery in this case and asked

for all documentation about A.H., did you look for those clock-in and clock-out records that you have for her?

A. They clock-in As I said, the clock-in and clock-out records were confiscated by the -- these -- when they raided. They took everything. All we have was the pay stubs and W2 form.

Q. Tell me what you mean when you say pay stubs. Is that like canceled checks?

A. Not the cancel. Like he generates a pay stub. Like, yeah, cancelled checks.

Q. Okay.

A. Yeah.

Q. And so -- Strike that.

When you paid Ms. H., for example, does your accountant pay her --

A. Yes.

Q. -- or do you write her a check?

A. I write her a check. My accountant creates like a pay stub.

Q. I see.

A. So that pay stub says so much is deducted, and so much he had to write a check.

Q. Okay. And so --

A. So I write a check and give it to them.

Q. The pay stub for Ms. H. for each week would show how

for a site visit, yes?
A. Yes.
Q. When you did your onboarding -- the week of onboarding with Budgetel, did that -- in 2016, did that training include any information on identifying or preventing human trafficking?
A. No, I never heard about that.
Q. Okay. Have you ever received any training on how to identify or prevent human trafficking?
A. No.
Q. Okay. And similarly, you've never given any of that training to any of your employees, correct?
A. Yeah, it was new to me.
Q. Okay. Gotcha.
A. It was -- I still I don't understand what's the real...
Q. When you said it's new to you, was that when Mr. Tiwari got arrested and pled guilty for human trafficking, is that when you're talking about it was new to you?
A. Well, yeah, I've heard about that terminology, but yeah, it was new to me.
Q. Okay. And prior to Mr. Tiwari being arrested and pleading guilty to human trafficking, you -- you didn't have any knowledge about the signs of human trafficking?
A. No.

Q. But on the front of it, it looks to me like a spreadsheet showing the hours worked for employees?
A. Yeah, yeah, yeah.
Q. Okay. And so in June of 2021, these are folks that worked there, along with a spreadsheet of each date and the hours that they worked?
A. Hours, yes, exactly.
Q. All right. And this -- Was this spreadsheet generated from the clock in/clock out?
A. Yeah, this is the one I was talking to.
Q. I see. Okay. Got. It. Back up for me to one page to 614, that notebook with the writing on it that we didn't know what it was. Is that Tiwari -- Shreesh Tiwari's handwriting?
A. Yeah, that's Shreesh Tiwari.
Q. Okay. And then go ahead to 617, same thing. Do you know what this is? It looks to me to be some sort of payroll calculation, but if you know.
A. Yeah, maybe. I don't know. I don't -- I don't understand, but something, yeah.
Q. Okay. And is this Tiwari's handwriting too?
A. Yes.
Q. Okay. The spreadsheet we looked at on 615, do you create these, or did Shreesh Tiwari create this, or do you know?

A. I created and give it to him. He maintains that, I think. It's a common thing we have.
Q. That spreadsheet that we see?
A. Yeah.
Q. You created those spreadsheets?
A. Yes.
Q. Okay. And then you would give that spreadsheet to your accountant?
A. Yeah. Yeah, this -- this goes to the accountant.
Q. Okay. And so the accountant should still have all these spreadsheets to your knowledge?
A. I think so.
Q. Okay. Got it. And was there one for each week, the spreadsheets?
A. Yes.
Q. Okay. All right. Go to 619 for me. This looks like room folios for guests. Is this what a guest receives when they check out?
A. I will have to check what it is.
Q. If you don't know, that's fine.
A. I don't know what that is.
Q. Okay. All right. Flip to 623, for me please. Looks to me like this is two credit cards, or a credit card, or excuse me, strike that. Two debit cards and a driver's license for somebody named Haley, one time last name Hubble,

another time last name Jackson. Do you know Haley Jackson or Haley Hubble?
A. No.
Q. Do you know why Haley Hubble or Jackson's driver's license and debit cards were at the front desk at the Budgetel?
A. I have no idea.
Q. Okay. Flip to 625 for me, please, which is a picture of a laptop.
A. Yes.
Q. Is this -- Is this the laptop that Mr. Tiwari used for his work at the Budgetel?
A. Yeah.
Q. And did you provide him with this laptop?
A. His own, I think. I don't. It's not mine.
Q. Okay.
A. He did provide. He has his own.
Q. All right. So you provided the computers at the front desk.
A. Front desk, yeah.
Q. And then if he used his own laptop, that was his own personal?
A. His own personal.
Q. Did you provide Mr. Tiwari with any laptop?
A. No.

Q. Okay. All right. Flip ahead to 632. It's a -- it's like a credit card for A.H. Do know why A.H. credit card was at the front desk of the hotel?

A. I have no idea. Is that the front desk? I don't know.

Q. Flip ahead for -- on 638, same thing again. These are the spreadsheets like y'all did for paying?

A. Yeah.

Q. How about 642. Let's look at that for me. It looks like there's some baseball bats that are stored near the front desk of the hotel. Do you know why there was -- Well, first of all, are those your baseball bats?

A. No.

Q. Do you know whose baseball bats they are?

A. I don't know.

Q. Do you know why they were stored near the front desk of the hotel?

A. There's a lot of stuff, like cleaning thing. I don't know.

Q. Right. My question is specifically about those. There's two baseball bats there. You can see them in the next -- well, at least one of them. You can see in the next photo too. Do you know why baseball bats were stored near the front desk of the hotel?

A. I don't know. I have no idea.

Q. All right. Go ahead to 644 for me, please. I think this is the safe you were telling me about?
A. Yes.
Q. Okay. And inside the safe, at least on the day of the raid, there was a pistol in addition to the cash. Do you know whose pistol that was?
A. That's -- I think that's Shreesh. That I'm not aware of it -- it was there.
Q. Okay. Did you ever see Shreesh with a gun on the property?
A. No.
Q. Did you know that Shreesh had a gun?
A. I didn't know that.
Q. Did you know -- Do you know if Shreesh ever carried a gun?
A. No.
Q. If you knew Shreesh carried a gun, would you tell him not to?
A. I would say no, yeah, no to that.
Q. All right. Prior to seeing it in this photo, had you ever seen Shreesh's gun in person?
A. No.
Q. All right. How did you know that was Shreesh's gun?
A. They told me that on the raid -- day of the raid, they said they disclosed that he had a gun in the safe

Q. Are all of these items things that you owned?
A. Not all of them. I don't know. Some of them were not mine.
Q. Okay. Let's talk about which of these things, if you know, belonged to you. Security camera system, that's yours?
A. Yes.
Q. How about the desktop computers? Those are both yours?
A. Both mine.
Q. The Ace or laptop; is that yours?
A. Yes.
Q. The HP Chromebook; is that yours?
A. That's not mine.
Q. Okay. How about the Dell laptop; is that yours?
A. That's also not mine.
Q. Okay. How about the Samsung tablet?
A. That's not mine.
Q. All right. Looks like the next two are Samsung cell phones?
A. I never owned a Samsung cell phone, no.
Q. Okay. Evo laptop, blue?
A. No.
Q. Okay. And then the rest of these are all cell phones. Any of these your cell phones?

A. No.
Q. Okay. So it looks like the stuff on here that they seized that belongs to you is the first --
A. Three --
Q. -- four items?
A. Four, yeah.
Q. The Acer laptop, the two desktop computers, and the security camera system?
A. Yeah. Maybe the Dell laptop also is mine probably.
Q. Oh, Dell laptop too?
A. Yeah.
Q. Okay. All right. So there were security camera system, the two desktops, the Acer laptop, and the Dell laptop --
A. Yeah.
Q. -- those are your property?
A. Yeah.
Q. Okay. And you have not been able to get any of those back so far?
A. No, no.
Q. Okay. All right. Those desktop computers, Acer laptop and Dell laptop, those are all things that were used in the Budgetel's business?
A. Business, yeah.
Q. The other things on here, you don't know who they

belong to or what they were used for, correct?
A. Yeah.
Q. Those Acer laptop, Dell laptop and desktop computers, when you would visit the hotel, did you have access to all of those?
A. Yes.
Q. And the security camera system?
A. Yes.
Q. You would use all of those equipment?
A. Yes.
Q. Okay. All right. In some of the - and I can show it to you if you'd like - in some of the Department of Homeland Security information that we received, you are referred to as big Sri and Shreesh is referred to as little Shreesh. Is that a nickname that you had at the hotel?
A. I didn't know that.
Q. Okay.
A. I didn't know that.
Q. Had you ever heard anybody refer to Shreesh Tiwari as little Shreesh before?
A. No.
Q. Okay. And never heard any -- Similarly, never heard anybody refer to you as big Sri?
A. Big Sri, no.
Q. In our discovery request, we asked if you routinely

checked the reviews of the Budgetel online, and you told us that you did; is that true?

A. Yeah.

Q. Well, did you have a habit of checking the reviews, Google reviews and stuff once a week or once a month?

A. Once a month, maybe.

Q. Okay. And was that your habit that you check the reviews at the Budgetel once a month the whole time you owned it?

A. Yeah.

Q. Do you still do that?

A. Not now.

Q. Okay.

A. Since this new management took over --

Q. Okay.

A. -- they're taking more and more active role in that.

Q. Okay. But from the time you bought the hotel in October 2016 until the raid on June 29th of 2021, you were checking the reviews of the hotel on Google and other sites once a month?

A. Yeah, once a month.

Q. Okay. And if you saw anything concerning there, you would try to address it?

A. Yes.

Q. Did you ever see any reviews about crime or

prostitution or drugs or anything like that?
A. No, I have never seen anything like that.
Q. Okay. Other than Google, did you check for reviews at Yelp?
A. I never seen Yelp.
Q. Just Google, is that where you --
A. Google.
Q. Yes, just Google?
A. Google. Just Google.
Q. Okay. Obviously, when you are at the Budgetel, you are the person in charge and the highest ranking person there?
A. Yes.
Q. When you are not at the hotel, the highest ranking person on the property when he was the site manager was Shreesh Tiwari?
A. Shreesh Tiwari.
Q. Do you, as we sit here today, do you recall any specific conversations you ever had with A.H.?
A. Yeah, once in a while we -- we have conversations about the work there and everything.
Q. Okay.
A. I still remember once or twice -- This is my habit like asking other employees how things are going here and all that. And I still remember that once or twice I had an opportunity to interact with A. How were things going here,