**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

A.H.,

Plaintiff,

v.

CIVIL ACTION FILE
NO. 4:24-cv-00224-WMR

CARSON LOOP ESM, LLC d/b/a BUDGETEL; and SRINIVAS BOLLEPALLI,

Defendants.

# PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE OPINION TESTIMONY OF SPECIAL AGENT JAMES RIVES

## INTRODUCTION

Defendants' manager, Shreesh Tiwari, used his position and power at Defendants' hotel to coerce A.H. into labor and sex acts. A federal investigation exposed it. Tiwari pled guilty to forced labor under 18 U.S.C. § 1590 and admitted in the factual basis that he obtained Plaintiff's "labor or services" by using "force, fraud, and coercion to compel [her] to perform sex acts upon [Tiwari] in exchange for a thing of value, to wit, her room at the Budgetel." [Doc. No. 75-2, Ex. C, Guilty Plea]. That is a commercial sex act obtained by coercion—sex trafficking. The plea deal spared Tiwari the § 1591 charge and its mandatory minimum sentence. It did

not spare him the facts. In short, the federal investigation resulted in Tiwari admitting the facts that prove the labor and sex trafficking of Plaintiff.

Defendants argue that the agent who led that investigation, Special Agent Jim Rives of Homeland Security Investigations ("HSI"), the investigative arm of the Department of Homeland Security, is a Keystone Cop who somehow obtained that guilty plea and restitution order for ***seven victims of Tiwari***, *id*. ¶ 23, by doing little more than talking to A.H. in the course of an "ad-hoc, unreviewed investigation." [Doc. No. 104 at 12]. Of course, that is untrue.

It's notable that Defendants have separately moved to exclude the documentary evidence of what seems to be a rather thorough investigation that found "bats, firearms, and other paraphernalia" at the Budgetel. [Doc. No. 103 at 11]. That's not nearly all Rives's team found, though. Defendants' computers contained photos and videos of victims performing oral sex on Tiwari, text messages between Tiwari and a victim, photographs of several trafficking victims, and payroll files, among other evidence. [Doc. No. 76-4, Ex. I, HSI Report]. Bollepalli admits that the desktop computers, laptops, and security camera system seized that day were his, were used in the Budgetel's business, and were equipment he himself accessed and used on his visits to the hotel. Ex. 1, Bollepalli Dep. 118:4–120:10. Arguing an entire investigation is based on the interview of a single person is only possible so long as all the other evidence in the investigation is ignored.

Rives did not just interview A.H. and take her word for it. Witnesses—including an employee of Defendants' hotel—identified A.H. as a potential victim before Rives located her. Rives and other officers interviewed multiple witnesses, reviewed law-enforcement records, obtained a federal search warrant, searched the Budgetel with the GBI and sheriff's office, recovered A.H.'s identification and belongings from Tiwari's quarters, examined electronic evidence, and personally interviewed both Tiwari and Defendant Srinivas Bollepalli. Rives testified that other witnesses and electronic evidence corroborated portions of the allegations. Ex. 2, Rives Dep. 17:23–24:3, 138:8–139:5.

Bollepalli told the federal agent that Tiwari operated the motel and handled its day-to-day business; that he was paid $3,000 each month; and that a 10 p.m. curfew existed because of drug activity. *Id*. at 20:15–22:2. Confronted with the resulting federal investigative report during his deposition, Bollepalli disputed the account of Tiwari's responsibilities and denied remembering his curfew statement. Ex. 1, Bollepalli Dep. 126:3–127:17. Rives is a firsthand witness to what Bollepalli said. A fact witness. In fact, Defendants' own witness list includes Rives. [Doc. No. 95 at 83–84].

What's more, Defendants insist that the investigation and underlying trafficking are irrelevant because Tiwari is not a defendant. [Doc. No. 104 at 14–15]. The joint pretrial order—signed by Defendants—calls that bluff: they expressly

dispute whether Tiwari trafficked A.H., designate that question as a trial issue, and submit a verdict form asking the jury to answer it. [Doc. No. 95 at 16–17, 74, 96–98]. The fact that Defendants are electing to defend their manager's conduct in front of a jury does not make what he did disappear.

Rule 702 does not require an experienced federal investigator to publish scientific studies before explaining the methods and indicators of crimes he is trained to investigate. And Defendants' motion is directed to Rives's expert opinions, not his firsthand factual testimony. To the extent an individual question seeks an unsupported medical diagnosis, a declaration that a particular witness is truthful, or a legal instruction about who is liable, an objection to that question—not disqualification of the investigator—is the proper response. The Court should deny the motion.

## I. The agent and investigation Defendants describe are a fiction.

### A. Rives has spent nearly two decades investigating federal crimes, and his training in trafficking did not end at the academy.

Rives worked as a police officer in Alpharetta before joining HSI. He had served almost 19 years as a federal special agent when he was deposed. His assignments included child exploitation, human trafficking, smuggling, narcotics, and other federal crimes. He attended almost six months of training at the Federal Law Enforcement Training Center, received training in interviewing victims of sexual crimes and in sex- and labor-trafficking investigations, and has conducted

numerous victim interviews and testified routinely about his investigations. Ex. 2, Rives Dep. 8:20–11:5.

Defendants emphasize Rives's concession that trafficking occupied only a small portion of his original academy curriculum. But they omit the rest of his answer. Rives testified that HSI requires ***annual*** online trafficking instruction, that the training includes scenarios concerning sex trafficking, and that it teaches agents to recognize trafficking indicators. He receives recurring instruction on labor trafficking as well. *Id*. at 108:21–111:5. Defense counsel elicited those admissions himself. And while Defendants mention in passing the mandatory annual training, their motion argues as though it doesn't exist.

Rives did not claim to be a psychiatrist, academic sociologist, or pioneer in trafficking research. He is an experienced federal criminal investigator, and his expertise is the investigation of crimes—including crimes using threats, dependence, and control to exploit vulnerable people. Rule 702 expressly permits qualification by practical "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The Court should measure Rives against the testimony actually offered, not some invented requirement that every trafficking investigator have a doctorate or a published scientific study.

### B. The evidence was collected, tested against other sources, and corroborated—not simply accepted from A.H.

Rives's work began with a trafficking tip. Investigators then contacted its

source, reviewed records, and investigated complaints involving the hotel. A witness identified in the federal warrant affidavit as J.R., who worked at the Budgetel, told investigators that A.H. was having sex with Tiwari instead of paying room rent. A separate witness, K.M., also identified A.H. to investigators. Ex. 2, Rives Dep. 13:19–18:19. These are particularly significant investigative leads: they preceded Rives's interview of A.H. and originated with people other than A.H. They demonstrate that investigators were not merely repeating her account.

Rives then submitted a probable-cause affidavit, obtained a federal warrant, and led the search of the Budgetel on June 29, 2021, with assistance from the GBI and the Bartow County Sheriff's Office. *Id*. at 17:7–20:1. Behind the lobby, in Tiwari's living quarters, investigators recovered belongings of other people, including A.H.'s identification, credit cards, and sex toys; they also recovered wooden paddles, a firearm, and drug paraphernalia. *Id*. at 22:3–24. Rives identified the photographs as accurately depicting the conditions officers encountered. *Id*. at 23:1–10. Defendants may dispute the significance of particular objects. They cannot plausibly claim the investigation consisted only of an interview.

Other corroboration emerged from additional sources. Rives testified that examinations of computers and phones corroborated witness accounts and that other witnesses described threats of eviction linked to compelled sexual acts. *Id*. at 138:8–139:5. He also discussed contractors who had observed inappropriate conduct

toward A.H. and circumstances concerning her dog. *Id*. at 143:21–145:6. The contractors did not witness the oral sex. But their account, J.R.'s report, and the seized materials are three sources of corroboration that did not come from A.H. The Court may consider those accounts in deciding this motion, Fed. R. Evid. 104(a); Rives may rely on them as a basis for opinion, Fed. R. Evid. 703; whether they reach the jury for their truth is a trial question.

Rives's reports were contemporaneous and subject to supervisory review. *Id.* at 12:12-24. He explained that each report of investigation ("ROI") was reviewed when generated. He did not know every criterion applied by his supervisor, Darren Webb, and could not say whether a final, global review had occurred. *Id*. at 111:22–114:10. That testimony is a far cry from the defense suggestion that nobody meaningfully reviewed his work. Defendants isolate uncertainty about one kind of review while overlooking the review Rives affirmatively described.

That is the investigation that actually happened. Tiwari did not plead guilty to a federal felony and agree to his removal because of a few "unreliable interviews." [Doc. No. 104 at 8; Doc. No. 75-2, Ex. C ¶¶ 1, 9].

## II. Federal law does not require a trafficking investigator to conduct peer-reviewed laboratory experiments.

Rule 702 requires Plaintiff to establish by a preponderance of the evidence that the particular expert testimony is helpful, rests on sufficient facts or data, uses

reliable principles and methods, and reflects a reliable application to this case.[1] Plaintiff accepts that burden. But the Rule does not require treating nonscientific law enforcement experience as if it were chemistry. See *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150–52 (1999). The advisory committee notes to the rule expressly discuss an agent's experience-based explanation of criminal code words as a proper illustration of specialized expertise. Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

In *United States v. Garcia*, 447 F.3d 1327, 1335–37 (11th Cir. 2006), the Eleventh Circuit upheld the admission of a DEA agent's experience-based opinions explaining criminal organizations and their methods. The agent relied on the usual tools of law enforcement—interviews, accumulated training, surveillance and corroborated evidence—not controlled experiments or published theories. The agent had attended a 16-week DEA training course; the rest of his expertise came from working cases. 447 F.3d at 1335. The court found no abuse of discretion in qualifying him. There is no requirement that a criminal investigator reinvent scientific research before explaining how evidence and conduct fit trained investigative patterns.

---

[1] Defendants quote the pre-2023 text of Rule 702, which omits the preponderance standard and the amended wording of subdivision (d). Compare [Doc. No. 104 at 3] with Fed. R. Evid. 702.

The comparison to *Garcia* is especially apt. Rives traced leads to witnesses and records, obtained judicial authorization, searched the site with other agencies, examined what was recovered, compared accounts, and documented the investigation in routine reports. Ex. 2, Rives Dep. 13:19–24:3, 111:22–114:10, 138:8–139:5. That is a recognizable investigative methodology. Defendants may cross-examine him about what he did not do: he did not audit all the hotel's financial records, independently reconstruct every rent payment, or personally witness every encounter. *Id*. at 123:11–23, 133:12–18, 138:1–7. But it is wrong to turn such credibility questions into a categorical absence of methodology or reliable basis. Similarly, *United States v. Walker*, 73 F.4th 915 (11th Cir. 2023), illustrates why specialized law enforcement context can assist a jury in a trafficking prosecution. There, an FBI agent provided trafficking-related background and explained patterns of manipulation and dependency relevant to coercion. *Id.* at 918, 932-34*; see also Carrizosa v. Chiquita Brands International, Inc.*, 47 F.4th 1278, 1317–18 (11th Cir. 2022) (explaining why reliability criteria designed for hard science do not mechanically govern experience- and observation-dependent social-science testimony).

This Court has already recognized that *Daubert's* hard-science factors do not mechanically govern experience-based testimony in hotel sex-trafficking cases. In *Does 1–4 v. Red Roof Inns, Inc.*, 688 F. Supp. 3d 1364 (N.D. Ga. 2023), the Court

rejected a challenge to a psychologist's testimony concerning sexual trauma, applying *Carrizosa* and recognizing that professional experience, training, and observation can establish reliability even when traditional scientific testing is inapplicable. Rives is not a psychologist, and Plaintiff does not offer him as one. But the same distinction between scientific experimentation and experience-based expertise applies to his work as a federal investigator.

Plaintiff disclosed Rives because he will offer experience-based opinions about his trafficking investigation, its findings, and victim behaviors investigators commonly encounter, such as delayed disclosure. These are based on his training, experience, investigation, and produced files. [Doc. No. 95 at 81–82]. Most of Rives's testimony is fact testimony. Where a question calls on his training and experience beyond this investigation, Plaintiff will say so, so the jury and the Court know which hat he is wearing. *See United States v. Hawkins*, 934 F.3d 1251, 1261–66 (11th Cir. 2019). Those opinions are: (1) the procedures and investigative indicators Rives uses in sex- and labor-trafficking investigations; (2) the relationship between coercive threats involving housing, wages, and employment and a vulnerable person's circumstances, to the extent supported by his actual training and experience; and (3) how the facts he investigated compare with the trafficking indicators he was trained to recognize. His conduct, interviews, observations, and physical discoveries are separately admissible as factual testimony under Rules 602

and 701. Defendants make no argument that Rives is not an appropriate fact witness, and, indeed, list him on their own witness list. [Doc. No. 95 at 83–84].

And each of those opinions comes from somewhere specific, which is the showing the Eleventh Circuit demands of an experience-based expert. *Carrizosa,* 47 F.4th at 1322 (an expert relying on experience "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts"). How a trafficking investigation works—tip, record checks, interviews, probable cause, warrant, seizure, corroboration—is the sequence Rives ran in this case and has run before. Ex. 2, Rives Dep. 13:19–20:18. What indicators to look for is the subject of the training HSI requires of him every year. *Id*. at 109:14–110:11. How to handle victims, including when to bring in a victim specialist, is agency practice he followed here. *Id*. at 114:19–115:3. His understanding of coercion through shelter and pay is not theory. He learned in this investigation that most of Tiwari's victims had been placed at the Budgetel on shelter vouchers and were controlled through the roof over their heads, *id*. at 29:16–31:6, 49:3–9; that residents reported Tiwari planted drug paraphernalia in rooms to manufacture grounds for throwing people out, *id*. at 26:3–12; and, across his career, that victims disclose late and in pieces, *id*. at 81:17–82:10, 93:22–94:2, 107:3–25. His comparison of the facts to those indicators rests on the findings themselves—the pay-and-rent offset, the isolation, the evictions and

lockouts, the dog, oral sex for shelter—and on the physical, electronic, and witness evidence that corroborated them. *Id.* at 27:19–34:8, 138:8–139:5. That is not an expert who "never explained 'how his experience . . . supported his opinion.'" *Carrizosa*, 47 F.4th at 1322–23. It is an agent explaining exactly that.

Plaintiff does not ask Rives to supply a clinical diagnosis or calculate psychological damages. Rives is eminently qualified to opine on the matters above. His expertise is helpful and should not be excluded from trial.

## III. Defendants' claim that the trafficking investigation is irrelevant is contradicted by their pretrial order.

Defendants assert that Rives's opinions concerning the underlying trafficking are "not at issue in this litigation" because Tiwari is not a named defendant. [Doc. No. 104 at 14–15]. Yet Defendants' own pretrial outline says they dispute whether the underlying trafficking occurred. [Doc. No. 95 at 74]. Defendants' own motions in limine, filed the same day, say Plaintiff's burden includes proving "that the Defendant participated in an undertaking that violated the TVPRA." [Doc. No. 103 at 3]. Their own list of trial issues begins by asking whether Tiwari's actions constituted sex trafficking and labor trafficking of A.H. [Doc. No. 95 at 16–17]. And their proposed verdict form specifically asks the jury whether Tiwari caused A.H. to engage in a commercial sex act. [*Id.* at 96–98]. It is hard to imagine a cleaner demonstration that Rives's evidence goes to disputed facts the jury will actually decide.

In addition to their own filings contradicting their argument, the law is also against Defendants. A civil beneficiary claim under § 1595(a) requires a venture that engaged in an act violating the TVPRA. The predicate conduct matters whether or not the perpetrator has been joined as a defendant. *A.G. v. Northbrook Industries, Inc.*, 171 F.4th 1257 (11th Cir. 2026), held that § 1595 does not require knowledge of the particular victim, *id.* at 1270, and that the venture in which a defendant participates need not itself be a sex-trafficking venture, *id.* at 1269–70.

The venture here is the Budgetel itself. The instruments of coercion Tiwari admitted to were the hotel's. He hired A.H. as a maid and set her wages against her room charge, $150 and $150, then $200 and $200. [Doc. No. 75-2, Ex. C ¶ 13(b)]. He "evicted" her by changing her key, locking her out overnight, and making her come to the office for a new one. [*Id.* ¶ 13(j)]. He forbade her from speaking to guests and other employees and threatened eviction when he found her in another employee's room. [*Id.* ¶ 13(g)]. He threatened to have her car towed off the property. [*Id.* ¶ 13(k)]. He promised her pay stubs to help her regain custody of her son. [*Id.* ¶ 13(e)]. And the price of keeping her room was oral sex. [*Id.* ¶ 13(l)]. Wages, rent, keys, the office, the rules for guests and employees, the parking lot—every lever he pulled belonged to Defendants. That matters because "nothing in the plain language of § 1595(a) requires that the 'venture' be a 'sex trafficking venture'"; the venture need only have "engage[d] in an act in violation" of the TVPRA. *A.G.*, 171 F.4th at

[1269–70]. A motel whose salaried manager ran that scheme out of its own front office is not an arm's-length landlord, and evidence of how the scheme worked is not evidence about "someone else."

Rives personally interviewed Bollepalli and participated in the interview of Tiwari. Ex. 2, Rives Dep. 20:15–17, 23:11–14. Bollepalli said Tiwari ran day-to-day operations and was paid $3,000 a month. Tiwari confirmed that he was the general manager and was paid by Bollepalli to operate the hotel. *Id*. at 20:22–24:3. Their statements concern the same business authority that A.H. contends Tiwari used to control her shelter, wages, and continued presence at the property. Those are material facts concerning the venture, not peripheral details of someone else's conduct. Whether Defendants possessed the required knowledge or benefited within § 1595(a) remains for the jury. Rives need not opine on the ultimate legal answer to help the jury understand the relevant circumstances.

Likewise, a jury may readily understand that threatening to evict someone is unpleasant. But understanding how an employer who controls a resident-worker's wages, shelter, access to belongings, and ability to avoid homelessness can use those circumstances to compel labor or sex may benefit from specialized investigative experience. The statutes address coerced labor and commercial sex, not only chains or locked doors. 18 U.S.C. §§ 1589(a), 1591(e)(2)–(3), (5). Defendants' claim that

A.H. can tell her own story is no reason to bar context from a trained investigator whose investigation resulted in a conviction.

**IV. Defendants do not seek to exclude Rives's factual testimony.**

Defendants' motion only asks that Rives be excluded "as an expert" on the issues for which Plaintiff would offer his opinions. [Doc. No. 104 at 1, 18]. It does not establish any basis to exclude him or his highly relevant factual testimony. In fact, Defendants themselves designated Rives as a potential trial witness and listed the federal investigative files, warrant, guilty plea, photographs, and video as potential exhibits. [Doc. No. 95 at 83–84, 92–94].

The distinction is straightforward. Rule 602 permits Rives to testify about what he saw, did, seized, recorded, and personally heard. Rule 701 permits appropriate opinions rationally based on his perception that do not depend on specialized expertise. When he explains general trafficking indicators, specialized coercion dynamics, or the significance of patterns derived from his law-enforcement training and experience, Rule 702 may apply. These categories can coexist in one witness. *See Hawkins, 934 F.3d at 1261–66.*

Defendants do not challenge Rives's competence as a fact witness in this motion. That he spoke with Bollepalli during the raid. That Bollepalli told him that Tiwari operated the motel and handled daily business. That Tiwari received a $3,000 monthly salary, and that the 10 p.m. curfew was imposed because of drug activity.

[Ex. 2, Rives Dep. 20:15–22:2]. In deposition, Bollepalli denied remembering the statement about drugs and rejected the report's characterization of Tiwari's responsibilities. [Ex. 1, Bollepalli Dep. 126:3–127:17]. The same applies to his personal presence when the warrant was executed, his identification and authentication of investigative photographs, his observations of the manager's quarters, the items recovered, and Tiwari's descriptions of his job. [Ex. 2, Rives Dep. 18:20–24:3]. Most of what Rives will say is fact; the expert component explains why certain facts matter in a trafficking investigation.

## CONCLUSION

Defendants ask the Court to treat a federal agent who investigated trafficking at their hotel, personally interviewed their owner and manager, led a search, recovered evidence, and contributed to the resulting criminal conviction as a witness with no relevant expertise and nothing useful to say. The record and the law refute that request. The Court should deny Defendants' motion to exclude Agent Rives's opinion testimony.

Respectfully submitted, October 28, 2026.

**ANDERSEN, TATE & CARR, P.C.**

*/s/ Jonathan S. Tonge*
PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE

Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile

**LAW & MORAN**

*/s/ Denise D. Hoying*
PETER A. LAW
Georgia Bar No. 439655
pete@lawmoran.com
E. MICHAEL MORAN
Georgia Bar No. 521602
mike@lawmoran.com
DENISE D. HOYING
Georgia Bar No. 236494
Denise@lawmoran.com

563 Spring Street N.W.
Atlanta, Georgia 30308
(404) 814-3700 | Telephone
(404) 842-7710 | Facsimile

# CERTIFICATE OF COMPLIANCE

Under Local Rules 5.1(C) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font type and size requirements and is formatted in Times New Roman, 14-point font.

ANDERSEN, TATE & CARR, P.C.

*/s/ Jonathan S. Tonge*

PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile