# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

________________________________

S.T.,
Plaintiff,
v. Civil Action
CARSON LOOP ESM, LLC d/b/a File No.
BUDGETEL, and SRINIVAS 4:24-CV-00225-WMR
BOLLEPALLI,
Defendants.

________________________________

A.H.,
Plaintiff,
v. Civil Action
CARSON LOOP ESM, LLC d/b/a File No.
BUDGETEL, and SRINIVAS 4:24-CV-00224-WMR
BOLLEPALLI,
Defendants.

________________________________

P R O C E E D I N G S

THE VIDEOGRAPHER: We are now on the video record. Today's date is December 16, 2025. The time is approximately 10:25 a.m. Eastern Standard Time.

Will the court reporter please swear in the witness?

THE REPORTER: I do have a small read on that I need to do.

I am a notary authorized to take acknowledgements and administer oaths in Georgia.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and
- shall constitute written stipulation of such.

At this time, will everyone in attendance please identify yourself, and then I will

swear in the witness.

MR. RIVES: Special Agent Jim Rives. I work for Homeland Security Investigations.

MS. HOYING: Denise Hoying on behalf of the plaintiffs.

MR. SWANSON: Stephen Swanson on behalf of Defendants Carson Loop ESM, LLC and Srinivas Bollepalli in the case entitled S.T. vs. those defendants pending in the District Court for -- United States District Court for the Northern District of Georgia, case number 4:24-CV-00225-WMR

MR. O'NEAL: Jacob O'Neal for the same Defendants in the A.H. vs. Carson Loop case, which is also given on the notice of deposition.

THE REPORTER: All right.

Well, hearing no objections I will now swear in the witness.

Will you please raise your right hand?

WHEREUPON,

JAMES RIVES,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: All right. Well, you may proceed, Counsel.

MS. HOYING: All right. This will be the deposition of Special Agent Jim Rives taken by agreement and notice. Everyone has agreed this is -- all objections are reserved except for the form and responsiveness.

MR. O'NEAL: Agreed.

MR. SWANSON: Yes. That's agreeable. Thank you.

MS. HOYING: And this deposition will be used for all purposes allowable under the Federal Rules of Civil Procedure.

EXAMINATION

BY MS. HOYING:

Q Good morning, Agent Rives.

A Good morning.

Q My name is Denise Hoying. I represent A.H. and S.T. in these cases. And I'm going to have some questions for you first, and then I suspect these other lawyers will, as well. Will you please state your name for us for the record?

A It's James Rives.

Q And where are you currently employed?

A The Department of Homeland Security, Homeland Security Investigations.

Q What's your title with the Department of

Homeland --

A Special Agent.

Q And what's your specific assignment with the department?

A We're the investigative arm of Homeland Security. We investigate all kinds of crimes that have a nexus to the border to include child exploitation, narcotics, human smuggling, and human trafficking.

Q All right. I want to talk a little bit about your training with the Department of Homeland Security. Can you tell us kind of generally about that? And then I might have some specific questions for you.

A So generally, like, we go to the Federal Law Enforcement Training Center once we're hired on for a period of almost six months. There we learn all kinds of stuff from basic law enforcement to different elements of federal law.

Q And for how long have you been with the department?

A Almost 19 years.

Q And what did you do for work before that?

A Prior to that, I worked as a police officer for the city of Alpharetta.

Q In your either your training with the city of Alpharetta or with the Department of Homeland Security, have you received training and instruction on the investigation of sex and labor trafficking?

A I have.

Q Over the course of your career, have you -- other than for this instance, have you participated in and conducted those investigations?

A I have.

Q Have you also been trained on interview and interrogation?

A I have.

Q And have you received specific training on interviewing victims of sex crimes?

A Yes ma'am.

Q Can you -- and you may not be able to, but can you estimate for us, ballpark, how many witness interviews you've conducted in your time with the Department of Homeland Security?

A Wow. I would say over 50.

Q And how many of those were victims of a crime?

A I would say the majority of them.

Q And as a part of your role as a special agent with the Department of Homeland Security, do you

testify in court about the results of your investigations?

A I do.

Q Is that something you do routinely?

A Yes, ma'am.

Q In your work, is it important in investigating crimes, including such crimes, to document -- memorialize what witnesses tell you?

A Correct.

Q And is that something that you do every time you speak with somebody?

A Correct.

Q And I want to kind of get to it. Were you the lead investigator for the Department of Homeland Security into allegations of sex and labor trafficking at the Budgetel located at 35 Carson Loop in Cartersville?

A Yes, ma'am.

Q And I'm going to hand you what we've marked just before you came in as Exhibit 16.

(Exhibit 16 was marked for identification.)

I will represent to you that these are documents that my office received in response to a Touhy request from the assistant U.S. attorney. What

are these documents generally?
A So this is what we call ROI. It's a report of investigation. It came from our internal system.
Q Okay. And are these -- all of these ROIs or reports of investigation contained in Exhibit 16, are these documents that you offered?
A Yes.
Q And are these all reports of your investigation into the allegations of sex and labor trafficking at the Budgetel?
A From my knowledge, yes.
Q Okay. Do you make these reports as part of your regular practice when you're performing an investigation?
A I do.
Q And are these reports kept in the ordinary course of your regular conducted business at the Department of Homeland Security?
A They are.
Q Did you make each of these reports at or about the same time that the interviews or other investigative events were taking place?
A Really close to when the event happened, yes.
Q All right. I'm going to show you what we

previously marked as part of Exhibit 2 in this case. Is this a photograph of the Budgetel that you were investigating the crimes to have occurred at?

A It is.

MR. SWANSON: Is this 1, Counsel?

MS. HOYING Sixteen. I usually just do them in chronological order, and I did one --

MR. SWANSON: Oh. You said this was 2. I just didn't know if this was 1.

MS. HOYING Yeah. This was 2 from Bollepalli's deposition.

MR. SWANSON: No worries.

MS. HOYING But it's already been marked.

MR. SWANSON: Got you. Thank you for clarifying.

MS. HOYING All right. Sure.

BY MS. HOYING

Q Generally, Agent, how did you become aware of the allegations that Shreesh Tiwari, the manager of the Budgetel, was trafficking women at the hotel?

A So in early 2021, a -- some information came to our tip lines -- a national tip line that Homeland Security has set up. You could report if you're a victim of trafficking or if you know of a trafficking

situation.
A call came in through that tip line that was in my area of responsibilities, what we call our AOR. So once that information came in, I just further investigated.
Q Okay. And so after you received that call, which I think is the second page of Exhibit 16 -- sort of details that call and what was received in that call -- what did you do next after you received that call?
A So after I received the call, we located the person who made the call, the allegation. And we went and spoke with that person.
Q Okay. And if you can -- and at least according to this ROI, the second page of Exhibit 16, that occurred on or about February 10th of 2021?
A Correct.
Q If you can flip ahead to the fourth page of Exhibit 16 for me, please. After you went and spoke with the person who made the call -- is the fourth page of Exhibit 16, which is ROI -- looks like number 2. Does this indicate what you did next?
A Correct. With the information I received from the initial tip, then we just start conducting record checks.

Q Okay. And when you started conducting record checks, did your investigation reveal that Shreesh Tiwari was the manager of the Budgetel, who ran day-to-day operations at the hotel?

A Yes, ma'am. I did.

Q Okay. And that he was a business partner with a gentleman by the name of Sri Bollepalli?

A Correct.

Q And did you, at that point, as part of your investigation, go to the Bartow County Sheriff's Office and sort of investigate other crimes that had occurred at the Budgetel?

A Correct.

Q Okay. And what did you -- at that point, what did you learn about sort of the -- either the volume or types of other crimes that had occurred at the hotel?

A So there was numerous calls for service from the Bartow -- received by the Bartow County Sheriff's Office. Those calls range everything from a theft, narcotics, domestic violence, and sexual harassment.

Q All right. And so if you flip ahead for me to -- I think it's ROI number 4. Let me ask you this. Is there -- do you number your reports of investigation sequentially when you fill them out?

A So the system does it for you. So if -- if I'm out of sequence, it will still number them one, two, three, four, five.

Q I see. Okay. These are the documents that we've received from the U.S. attorney's office. Is there a -- or should there be a ROI 3?

A There should.

Q Okay. That's what I thought. I just wanted to make sure. All right. And then as a result of the investigation that you had done so far, tell me about your phone call with S.T. on February 23rd of 2021.

A So I did locate a report from the Bartow County Sheriff's Office that S.T. was the victim labeled on the report. She report that she was sexually harassed at the Budgetel.

Q Okay. And so did you -- were you able to reach her on the phone to confirm what her report was?

A Correct.

Q Okay. Did she give you any additional or different information than what the police report indicated to your recollection?

A She did not.

Q Okay. Is all of the pertinent information that she told you contained in your report of investigation here?

A It is.
Q Okay. All right. I'm going to hand you in addition to what you have there what I'm going to mark as Exhibit 17.
(Exhibit 17 was marked for identification.)
Agent Rives, tell me what Exhibit 17 is.
A This is a search warrant for the Budgetel located at 35 Carson Loop, Cartersville, Georgia.
Q Okay. And attached to the request for search warrant is a -- I believe -- is this the probable cause affidavit that you submitted in order to receive that search warrant?
A Correct.
Q Okay. And does it fairly and accurately detail your investigation up until that point?
A It does.
Q Okay. Including -- I guess it's on pages 5 through 11 -- details your interviews with a variety of folks that you had spoken with at that -- by that point?
A Correct.
Q Did you -- there's a -- I want to point you to page 10, which discusses your interview with somebody by the name -- initials of J.R., who worked

at the hotel.

And that person provided you a name of A.H., last name unknown, who was having sex with Tiwari, in lieu of paying rent. Is that the first time you were made aware of a potential victim by the name of A.H.?

A I believe so.

Q Okay. And then paragraph 24 similarly discusses your contact with a potential victim by the name of -- initials of K.M.

And that person also provided you names of two ladies by the initials of A., one that worked as a housekeeper, and one that worked at the front desk. Were you ultimately able to determine that that person was A.H.?

A Yes, ma'am.

Q And was -- the results of your investigation, was A.H. the person who worked at the front desk or the housekeeper?

A I believe she worked both positions.

Q And in response to your affidavit -- your probable cause affidavit and request for search warrant, was the search warrant ultimately issued?

A It was.

Q Okay. And were you at the Budgetel when that search warrant was executed?

A I was.

Q Was it just you and other Department of Homeland Security folks or were there other agencies there?

A There was other agencies there.

Q Who else was there with you?

A The Georgia Bureau of Investigation and the Bartow County Sheriff's Office.

Q Okay. All right. Run me through the sort of general overview of the execution of that search warrant. What did y'all do that day?

A So operationally, you know, we served the search warrant on the Budgetel. I had multiple victims -- well, I was foreseeing multiple victim interviews. I had requested assistance of the Georgia Bureau of Investigation.

There's not very many Homeland Security agents in North Georgia. So I -- I used the GBI for victim interviews. The Bartow County's Sheriff's Office helped me secure the -- the hotel -- secure the perimeter of the hotel. It is a high crime area, so that -- they helped with that aspect of it.

Q And did you -- let's go walk through some of your ROIs on the day that the search warrant was executed, which I believe was June 29th of 2021. Does

that sound right?

A It does.

Q Okay. If you can flip to -- if you see on the -- it's part of ROI 9. The page number -- the Bates stamp on the bottom is TIWARI 344. It says near the top -- keep going. One more page. There you go.

Near the top of that ROI, it says, "HSI SA Jim Rives interviewed Big S., Tiwari," and then somebody that's redacted. Is Big S., is that Sri Bollepalli?

A So the residents at the -- yeah. It is. So the residents at the Budgetel, they -- they would identify them as Big Sri and Little Shreesh. I think they just had a -- a problem pronouncing names.

Q Got it. Okay. And so you interviewed personally both Sri Bollepalli and Shreesh Tiwari?

A I did.

Q Okay. And your interview with Sri Bollepalli is captured -- I think the substance of it is captured lower on this page.

A Correct.

Q Okay. And when you met with Sri Bollepalli, did he tell you that Shreesh Tiwari operated the motel and handled the day-to-day business of the motel for him?

A He did.
Q Okay. And it looks like it became apparent to you that Sri Bollepalli was not very involved, at least in the day-to-day kind of operations of checking in guests, that kind of thing.
A It did not appear so.
Q Okay. He told you, though, I believe, that -- did he -- or did he tell you that he was there approximately every other day?
A Yes, ma'am.
Q Okay. He also let you know that there was -- the hotel had instituted a 10 p.m. curfew due to the drug activity at the hotel?
A Correct.
Q Anything else of substance that he told you that day?
A I remember he was very -- of -- of substance, no. He was just concerned about why we were there. It -- it did seem like he was not familiar with the operation, 'cause he had a hard time making room keys. Had a difficult time, and he was very concerned about what his wife was going to think about the law enforcement presence at the motel.
Q Got you. All right. And did he also tell you at that time that he paid Shreesh Tiwari, as the

manager of the hotel, a salary of $3,000 a month?
A He did.
Q All right. And then the next page of this ROI talks about the search of the lobby and living area of Tiwari. Tell me what you found when you searched those particular areas.
A So there was a -- there was living quarters for Shreesh Tiwari in the lobby -- right behind the lobby. Is that what you want me to speak about or?
Q Please.
A So in there, we found documents or belongings of other people, a lot of what belonged to A.H. We found several IDs, credit cards. We found sex toys that belonged to A.H.
Q Did you also find wooden paddles?
A We did.
Q Okay. And were those in the lobby, or were those in his living quarters, or do you recall?
A I do not recall exactly where they were.
Q Okay. I did you also find a 9mm pistol in the safe?
A We did.
Q And did you also find drug paraphernalia?
A We did.
Q Okay. All right. I'm going to hand you

what was previously marked Exhibit 11 in the case. Agent Rives, are these the photographs that you or your fellow agents or investigators took when you executed the search warrant?

A They are.

Q And do these photographs fairly and accurately show the state of the lobby and the living quarters when you were conducting the -- or executing the search warrant?

A They do.

Q All right. In addition to your interview with Sri Bollepalli, were you there and participating in the interview with Shreesh Tiwari?

A I was.

Q Throughout the course of executing the search warrant and your investigation, do you have any specific recollection of ever seeing or receiving any paychecks that were written, or pay stubs given to A.H.?

A I don't recall.

Q Okay. All right. And in your interview with Shreesh Tiwari, did he confirm that he was the general manager of the hotel?

A He did.

Q And that he was paid by -- did he confirm

that he was paid by Sri Bollepalli to run the day-to-day operations?

A He did.

Q What explanation, if any, did Shreesh Tiwari give you for having A.H.'s documents, and sex toys, and other things in his office?

A I can't recall if he gave me an explanation, a reasonable one.

Q If you can flip ahead for me to -- on the bottom. It's ROI 21, but the bottom number is TIWARI 381. It's sort of three -- looks like 79, 80, and 81. Do those detail your investigation and interview with Shreesh Tiwari?

A It does.

Q Okay. And during that initial interview, did Mr. Tiwari tell you that they kept timecards for employees to sign in, and sign out, and take breaks, that kind of thing?

A Yes. He did.

Q Okay. And as we sit here today, do you have a specific recollection of receiving and reviewing those documents?

A I don't recall.

Q On the same day, did you participate in an interview with A.H.?

Q Did your investigation reveal why there was drug paraphernalia in the lobby?

A So based on the interviews from multiple different people that stayed there, it was believed that he would use that as leverage to remove people from the Budgetel.

Q Tell me what that means, that he would use it as leverage.

A According to the people at the residence, they say that -- that he would plant drug paraphernalia in the rooms -- in their rooms, and that was a reason for them to be removed.

Q Got you. All right. I'm going to ask you to flip ahead for me. Again, later the same day to the bottom of the page is TIWARI 448. It's ROI 38.

MR. SWANSON: I'm sorry. What was the number, Counsel?

MS. HOYING: It's 448 to 450. ROI 38.

MR. SWANSON: Thank you.

MS. HOYING Yup.

MR. SWANSON: I think we might be out of order here. So I went from -- you said 38?

MS. HOYING Yeah. Like I said, there's a lot on June 29th. So they may not --

MR. SWANSON: I went from 29 to 45.

MS. HOYING If you look at the very bottom down here, there's numbers. 448 is the number I'm on. Oh, it's before 29 and 45.

MR. O'NEAL: Yeah. It jumps out of order. It goes to, like, 55, and then 20 something, and then up to 400 something.

MR. SWANSON: I was going to say, I got my glasses on too. I don't -- all right. 448.

MS. HOYING 448.

BY MS. HOYING:

Q And does this ROI fairly and accurately detailed your initial interview with A.H.?

A It does.

Q Okay. And this one, along with the next ROI, which in the packet is 29, which is dated September 9, 2021 -- was that your follow-up interview with A.H.?

A It is.

Q Okay. And through the course of your interviews with her and your investigation, did your investigation reveal that Shreesh Tiwari, as the manager of the hotel, had isolated or attempted to isolate A.H. from her friends and family?

A Yes.

Q And did your investigation also reveal that

he would punish her if she would have conversations with guests or other employees of the hotel?

A Yes.

Q And did your investigation reveal that he would threaten to evict her from the hotel and cause her to be homeless if she didn't engage in sex acts with him?

A That was a threat. Yes.

Q Okay. Did your investigation reveal that he, while she was working as a housekeeper at the hotel, would grab her breasts and grow her between her thighs while she was working?

A Yes, ma'am.

Q Did your investigation also reveal that he would threaten A.H. that he was going to call DEFAX and report drug use, so she couldn't regain custody of her child?

A Yes, ma'am.

Q Did he also isolate her and make her believe that he was the only person in life that could help her? Was that an attempt that he made?

A It was an attempt. Yes.

Q Did your investigation reveal that he would force her to work long hours for no pay and engage in sex acts with him by manipulating his position of

power as the manager at hotel?
A Correct.
Q In your investigation of this incident and in 20 plus years of working in law enforcement with the department and the city of -- or I guess Alpharetta Police Department, is it your experience that these type of events are traumatic for folks -- victims to live through?
A Absolutely.
Q In your investigation, was A.H. -- did you determine that A.H. was the only person that Mr. Tiwari made, you know, these threats of eviction and manipulation to have sex -- perform sex acts with him?
A No, ma'am. She was not the only one.
Q Okay. Ballpark, how many victims did your investigation reveal that Mr. Tiwari took advantage of at the hotel?
A Ballpark, five.
Q Okay. Those ballpark five victims that Mr. Tiwari took advantage of at the hotel, either by forcing him to work long hours or perform sex acts with him, how did he find his victims?
A So the majority were placed there at the Budgetel. They had a -- an agreement with a Good

Neighbor Shelter that, you know, if you're down on your luck, there's a voucher of some sort that they will cover a certain amount of time that you could stay, so you have a roof over your head.

Q Were all of his victims that you determined as a result of your investigation -- were they all folks that were already at the hotel or were staying at the hotel? Is that when he began to victimize them?

A Correct.

Q Is it fair to say that his victims were women who were having a difficult time and were vulnerable for one reason or another?

MR. O'NEAL: Object to the form.

BY MS. HOYING:

Q You can answer.

A Most of them.

Q Did your investigation reveal that that was true of A.H.?

MR. O'NEAL: Same objection.

THE WITNESS: Correct.

BY MS. HOYING:

Q Okay. What were the -- if you recall, what were A.H.'s specific vulnerabilities that Mr. Tiwari, as a manager of the hotel, was able to take advantage

of?

A She was -- she had a substance abuse problem. She was just down across the board. She didn't have -- she had a financial issue. She didn't -- she had a -- she didn't have a place to stay.

Q Did your investigation that we've talked about today so far reveal that Mr. Tiwari's job, as the manager of the hotel, is what put him in a position to commit these specific crimes?

A Correct.

Q After Mr. Tiwari was arrested, were you involved in the criminal prosecution of him?

A I was.

Q I'm going to hand you what I've just marked as Exhibit 18, which is a copy of Mr. Tiwari's guilty plea in this case.

(Exhibit 18 was marked for identification.)

Agent Rives, were you in court when this guilty plea was entered?

A I believe so.

Q Okay. And I want to direct you specifically to page 5, the factual basis, which is paragraph 13 with several subparts. And the question specifically

is, does paragraph 13, the factual basis for the guilty plea in all of its subparts -- is victim one in those paragraphs -- does that refer to what your investigation revealed happened to A.H.?

A It is.

Q All right. She is the person that's identified here in the guilty plea as victim one?

A So I could answer that, but are we going to disclose who victim one is? Is that --

Q Yeah. It's my understanding that victim one is A.H.

A It -- it is.

Q Okay. All right. And just -- I want to go through some of those subparagraphs. And I'll try to do it as quickly as I can. Did your investigation into the events at the Budgetel reveal that A.H. was paid $150 a week to work at the motel, but was also charged $150 a week for her room?

A Correct.

Q And then later, her rent was increased to $200 a week, and she was at the same time given a raise to $200 a week?

A Correct.

Q Did your investigation reveal that she was working at the Budgetel at least 9 to 5, or from 9 to

5 most days, but sometimes had to work as late as 10 p.m.?

A Yes.

Q And we've already gone through some of this, but did your investigation reveal that she -- that originally, that Mr. Tiwari had promised that he would assist her regaining custody of her son?

A Yes.

Q But then he would later threaten to call DEFAX to report that she was using drugs?

A Yes, ma'am.

Q Did your investigation reveal that she -- he discouraged her from associating with friends, and family, and anybody else at the hotel?

A Yes, ma'am.

Q Did your investigation reveal that he would regularly evict A.H. from her room at the hotel when he would become angry with her, and change the locks, and lock her out all night?

A He would.

Q Did your investigation reveal that as punishment, he forced her to get rid of her dog that was allowed to live there with her?

A Correct.

Q And did he forced her to perform oral sex in

order to -- on him in order to stay at the motel?
A That was the agreement. Yes.
Q Okay. And that if she would not perform oral sex on him, that he was going to evict her?
A Correct.
Q And did she -- based on his threats and coercion, did she comply with that?
A She did.
Q Did your investigation into what occurred at the Budgetel reveal more likely than not that A.H. was a victim of sex trafficking at the motel?
A She was.
Q And did your investigation reveal more likely than not that A.H. was a victim of labor trafficking at the hotel?
A Yes.
MS. HOYING: Those are all the questions I have for you for now. These other lawyers will certainly have some questions for you. Thank you, sir.
MR. SWANSON: Counsel, you want to go or?
MR. O'NEAL: You go first.
MR. SWANSON: Okay.
//

Tiwari?

A I do not.

Q Okay. She would at least had to have been an employee of the hotel to be subject to labor trafficking; right? Is that a prerequisite?

A You wouldn't have to be an employee, like, on paper. You could just be -- I mean, you could be someone was taken advantage of if the agreement was a -- a roof over your head.

Q Okay. The guilty plea you were just talking about, the -- what you understand from your work to be the confession of Tiwari. I see on page 11 of that document, there appears to be a paragraph 23, the defendant agrees to pay a bunch of folks restitution. You see that about halfway down?

A I do.

Q Okay. The defendant is Shreesh Tiwari; right?

A Correct.

Q Okay. And there's seven folks who he had been ordered to pay restitution to; right?

A Correct.

Q Do you understand those people to be the folks that were -- what your investigation concluded were the victims of Shreesh Tiwari?

Q Was she the victim of labor trafficking as a result of Shreesh Tiwari?
A The evidence did not show she was.
Q Okay. Are you aware at all of the allegations that S.T. is making in this case?
A I am not.
Q Okay. In your investigation of and conversations with S.T., do you recall ever getting the feeling, or thinking, or talking with your coworkers, or having a law enforcement officer's intuition that S.T. was being incomplete with you?
A Being incomplete?
Q Yeah. Not telling you everything.
A Like, withholding information?
Q Yeah.
A I -- I do not.
Q She came across as credible?
A I believe so.
Q You believe that everything that she told you was what in fact happened to her?
A You know, that's a tough question, 'cause sometimes it takes a while for victims to disclose, but, you know, we tried. So, you know, I don't know if she withheld or not.
Q Okay. Your investigation did not include --

A It'd be unfair, because I've had victims -- it just takes some time some -- sometimes where it be -- 'cause they have to get in a secure place where they're not in the right mindset at that time.

Q Okay. Your investigation did not conclude with any credible information, or evidence, or testimony that --

A This investigation concluded before any disclosure from her. Sorry. I answered your question kind of reverse.

Q No. No. It's fine. And you're not aware of whether S.T. withheld anything from you as a -- during your investigation?

A I'm not aware of that.

Q If she did, you wouldn't know, because she withheld it; right?

A Correct.

Q Okay. She at least -- if she did withhold, she did it so well that you didn't think that she was withholding and needed to prod her more for anything; fair?

MS. HOYING: Objection.

You can answer.

THE WITNESS: Fair.

//

anything like that?
A I do not.
Q Okay. Did your investigation reveal or conclude that S.T. engaged in any sexual acts at all with Shreesh Tiwari, whether forced or consensual?
A Do I -- I don't have any evidence of that. No, sir.
Q Your investigation did not conclude that; right?
A Correct.
Q Your investigation actually concluded the opposite, that she refused all of his advances and left; right?
A By her statement.
Q Okay. Do you have anything else to contradict that, her statement?
A I do not.
Q Okay. Do you believe she was lying to you or lying to the authorities when giving her reports and interviews?
MS. HOYING: Objection.
THE WITNESS: Victims of crimes are slow sometimes disclosing, so for me to say, do I think she was lying, it would be unfair to victims across the board. For whatever reason, they're slow

to disclose. Do I think she was going to disclose more? I don't know.

MR. SWANSON: Okay. How close are we to the five-minute mark, sir?

THE VIDEOGRAPHER: One minute away.

MR. SWANSON: I thought I was going to be done. I'm sorry.

MS. HOYING: He's going to have questions anyway.

MR. SWANSON: I know.

MS. HOYING: So why don't we just take a break, and then --

MR. SWANSON: Yeah. That's fine. Let's just go ahead and go off. Thank you.

THE VIDEOGRAPHER: All right. We are off the video record at 12:14 p.m.

(Off the record.)

THE VIDEOGRAPHER: We are back on the video record. The time is 12:27 p.m.

BY MR. SWANSON:

Q Special Agent Rives, do you know someone with the Department of Justice by the name of Christy Jones?

A I do not.

Q Okay. Then I assume you were also not aware

Q If they're true; right?
A Correct.
Q In your experience talking to witnesses, overseeing five of these types of investigations, have you seen this type of shift in a victim's story from touching my butt to full-blown sex trafficking acts?
Is that a common -- I'm trying to understand. Is that a common thread that you see that material omissions of sexual acts are omitted from the investigation and testimony with --
A So I have seen -- I have seen shifts in story.
Q -- the investigating officer? Excuse me.
A I -- I -- yes. I have seen shifts in the story.
Q Okay. Yes. You have seen shifts?
A I have. Yes.
Q From not disclosing at all that sexual acts happened to full-blown sexual acts happened?
A Correct.
Q So this doesn't surprise you then, this change?
A I mean, it -- it doesn't surprise me, but I -- I don't know. I mean, it's her story. It's her words.

MR. SWANSON: Okay. I think that's all I have. Thank you.

Do you want to follow up or want him to go? And you'll --

MS. HOYING: He can go, and then I'll --

MR. O'NEAL: Okay. I have a few. I'm going to try to make it as quick as I can for everyone.

EXAMINATION

BY MR. O'NEAL:

Q Special Agent Rives, I'm Jacob O'Neal. I'm one of the attorneys representing the defendants in the parallel case filed by A.H. I have a few follow-up questions for you here.

You talked earlier about some of the training that you received through your law enforcement career, including sex and labor trafficking. Do you remember that?

A Yes, sir.

Q What was the training you received in sex trafficking?

A It's been nearly 20 years ago, so it -- it'd be hard for me to recall exactly what it was. I'm -- it was a -- a small block of instruction maybe within

a couple days of this -- almost six months I was there.
Q Okay. Any supplemental sex trafficking training since you received that training 20 years ago?
A Yes, sir. I've -- I've been in, like, conferences with, like, addition, like, information trends and stuff like that.
Q Okay. What about government mandated training, though? Was there, like, a curriculum from the government like that which you've received 20 years ago, or is this all, like, from independent sources?
A Some -- we do. We have -- we have, like, quite a bit of government mandatory training through our virtual online training, and there's a bunch of series of blocks. And one of them is trafficking, and they run you through online scenarios of sex trafficking.
Q And how often do you take that training?
A We have to take it yearly. It's mandatory for everyone.
Q Okay. Does that include spotting the signs of sex trafficking?
A It does.

Q What is your understanding of the signs of sex trafficking?
A So if I could just refer to this scenario. You watch a movie, and it's like, you know, that particular scenario is you walk into a club, and it's the first person point of view. There's a bouncer at the door, and, you know, it's the -- the real shady atmosphere.
There's money. Women are allowed to talk to the customers. That's just one scenario, but there's a lot of different indicators of sex trafficking.
Q Okay. Did you ever discuss any of those indicators when you were talking with Sri Bollepalli?
A I do not recall.
Q Okay. Did you ever ask Srinivas Bollepalli if he had ever seen any specific signs of sex trafficking?
A I believe I did.
Q Do you remember exactly what you asked him?
A I don't remember exactly what I asked him.
Q Okay. Do you recall his response at all?
A I remember his -- he was surprised by the allegations.
Q Okay. So switching gears from sex trafficking to labor trafficking, what was your

training in labor trafficking?
A It's almost the same as I just briefly stated about sex trafficking.
Q And do you also get that training yearly?
A Yes, sir.
Q Did you ever discuss the signs of labor trafficking with Sri Bollepalli?
A I -- I do not recall.
Q Do you remember if he said anything about what you would consider the signs of labor trafficking?
A No, sir.
Q You said earlier that there were numerous reports that Bartow is a troubled area. Did you ever discuss those reports with Sri Bollepalli?
A So it -- it's just that area where the Budgetel is sitting at, not Bartow being a troubled area. But that Carson Loop, there's two motels there. I don't recall discussing those reports with --
Q With Mr. Bollepalli?
A Correct.
Q Okay. You go back to Plaintiffs' Exhibit 16, and looking, for example, on the very first page in the left-hand margin, there's a box or a line, a section where it says, "Approved by Darren Web [ph],

resident agent." Do you see that?
A Yes, sir.
Q Who's Darren Web [ph]?
A So at that time, he was the -- we call him the resident agent in charge. He -- he's a group supervisor, and he's in charge, 'cause -- so I'm assigned to HSI Dalton -- Dalton, Georgia. It's called a RAC office.
And it's -- 'cause we're not assigned groups, 'cause we're a small office. We got to work in -- everything. So the supervisor there is called the resident agent in charge. It's just a different name for a supervisor.
Q And are you familiar with the review and approval process that Mr. Web [ph] would've used?
A That he would've used? Beyond just proofreading to make sure there was no grammar, misspellings.
Q Okay. So the stamp of approval is for those sort of mechanical things as opposed to, for example, substantively that this was done the right way or the information is correct. It's just about --
A Oh, no. No, sir. He would -- he would review it, I mean, if there was something in there that was -- that he would call different or

something -- if he was on scene, of course he would correct it or ask about it.

Q Okay. Do you know what the criteria are that he would use for doing that kind of substantive review?

A I do not.

Q At the end of your investigation -- well, let me back up. Were each of the individual reports reviewed as they were generated by you, the ROIs?

A Yes, sir.

Q Okay. At the end of the investigation, was there any sort of global review or certification that the investigation was properly conducted to your knowledge?

A We do have case file review to make sure all the -- the appropriate document is in the right spot. Before we went digital, and -- and I do not recall if this is over during that transition, but yes. There is a case file review.

Supervisor, it would come up for review. It's, like, a -- a set time. It'll alert the supervisor, "Hey, you got to do a case file review." And they'll ask you -- it's -- "Hey, where's this case at? Where do you expect it to go?" Those sort of questions.

Q Do you know if that case file review was done in this case?
A I -- I'm not sure.
Q Okay. Do you know who would've been responsible for doing the case file review of this investigation?
A It would've been Darren Web [ph].
Q Have you discussed your investigation with Mr. Web [ph] at any point after the investigation was completed?
A I have not.
Q Are there guidelines for conducting this kind of investigation that are imparted to you as part of your training?
A Guidelines?
Q Right. How to do what you did, how to investigate, for example, a sex trafficking allegation.
A You -- you learn through other investigations, like, what you could do within policy, proper investigative procedures.
One example is when you're dealing with victims, we have a victim specialist that we immediately involved, and she was named numerous times as a person who could talk to victims, who can offer

services if a victim's, for example, homeless, or has some kind of other need that arises during the investigation.

Q Is there a sort of published list of guidelines or standard operating procedures, or is it more of a corpus of just things you've learned over the years?

A Just more of what you've learned through the years.

Q So there wouldn't be at the end of an investigation like this an agency, you know, to say, "Yes, this interview is in compliance," or "No, it's not," or something like that?

A Like a standard operating procedure? No, sir.

Q No. Okay. Earlier you testified that after you got the call on the tip line and instituted the investigation, you started doing some record checks and looked into some law enforcement responses to the property. You recall talking about that?

A Yes, sir.

Q Did you ever interview the officers involved in the previous law enforcement responses to the property to determine if the reports you reviewed were accurate?

Q You referenced some paraphernalia, sex toys, and things that were discovered that belonged to A.H., but were not in her room. How did you learn that they belonged to her?

A I believe her -- some other personal belongings were in there with her name on it.

Q Okay. Did all the paraphernalia you concluded as belonging to her, did they have her name on it or did she tell you they were hers?

A She also told us they were hers.

Q How did you come to your understanding of what A.H. was paid for her work at the Budgetel?

A Based on her statements.

Q Did you review any documents supporting the statements that she made about her pay?

A Not that I recall.

Q What about what she paid for her hotel room? How did you arrive at your understanding of what she paid?

A By her statements.

Q Did you review any documents supporting her statements for what she paid?

A Not that I can recall.

Q You also mentioned earlier your opinion that Tiwari's answers to your interview were not credible.

A I do.
Q What are those that you know of?
MS. HOYING: She -- works at Homeland Security?
THE WITNESS: Yes.
MS. HOYING: You got to go through Homeland Security.
BY MR. O'NEAL:
Q Okay. But that's information that Homeland Security could get to us?
A Absolutely.
Q During your investigation, did you review any financial records of the Budgetel?
A No. I did not.
Q You talked earlier some about some witnesses saying they complained to Sri Bollepalli. Did A.H. tell you that she complained to Sri Bollepalli about Tiwari?
A I don't recall.
Q Okay. Do you recall specifically any other witnesses who told you that?
A I do recall -- I -- I can't recall exactly who, but there was mention that they -- they complained directly to him.
Q Okay. Do you remember if they told you

investigation who received the revenue from the rooms that was received by the Budgetel?

A I did not.

Q Or ultimately, which person or entity was responsible for paying the employees? Did you look into that as part of your investigation?

A No, ma'am.

Q We looked at some of the photographs that were taken by your team, and your ROIs detail, in addition to taking photographs that you examined, computers and cell phones that you found when you executed your search warrant.

A Correct.

Q And did your -- either the things you saw when you arrived to execute the search warrant or later were revealed on phones and computers that were in the lobby, did those examinations and the information contained on the phones and the computers -- did they corroborate the witness statements that you had taken in the case?

A They did.

Q And you had talked about that, you know, A.H. had told you that she would -- he would threaten to evict her if she didn't perform oral sex on him. Did other witnesses make the same complaint?

A They did.
Q So her statements were corroborated by evidence, both physical evidence and other witness statements, A.H.'s?
A Correct.
MS. HOYING: That's all I have. Thank you.
MR. SWANSON: A follow-up question with this. You said this is 19, Counsel?
MS. HOYING: Yes, sir.

EXAMINATION

BY MR. SWANSON:
Q Okay. Exhibit 19, you were just asked questions, Special Agent, about, I guess, the moment in time when you heard Shreesh Tiwari admit to doing all of these things; correct?
A Correct.
Q You remember being at this hearing now that you read through the transcript?
A I -- you know, I'm trying to get something just to -- so I could absolutely say I was here, and that's why I was thumbing through it.
Q Don't see a list of attendees or anything. I mean, if you were there, you would've been, like, I guess, in the gallery in the back. You wouldn't --

if this is the hearing that I -- I do recall.

And so they stressed the fact that this is not he's pleading to a deal, that he's pleading to the facts of what he did.

Q Right. But the result of all this is that he took a deal.

A Yes.

Q He confessed his guilt in open court.

A Correct.

Q And took a deal with the United States government.

A Correct.

Q I mean, the lay understanding is --

A The benefit of accepting responsibility, not going to trial.

MR. SWANSON: Okay. All right. That's all the questions I have. Thank you.

MR. O'NEAL: And one quick follow up.

EXAMINATION

BY MR. O'NEAL:

Q You were asked just a moment ago by Ms. Hoying about whether other witnesses corroborated what A.H. said. I want to be very specific. Did any other witnesses other than A.H. tell you that the interactions between A.H. and Mr. Tiwari actually took

place?

A Yes. The -- the contractors, 'cause I had not had -- I did not have A.H. fully identified. Only knew her as A. is what they were referring to her as. I don't know where the came from. I think it was a nickname.

But they kept saying, "You got to find

And they were alluding that A. got the worst of it, and "You need to find her." The contractors had a cell phone number for her, because of the dog.

I was able to contact her through that cell. But I think ultimately, those two contractors had some sort of friendship with her, 'cause they were watching her dog. Were able to talk her into coming.

Obviously she was scared, 'cause of law enforcement presence. She didn't know if she was in trouble or what the investigation was about.

Q Did the contractors tell you they observed Shreesh Tiwari engage in, or demand, or received oral sex from A.H.?

A They did not.

Q What specifically did they tell you?

A That he was being inappropriate with her, as far as gestures and comments.

Q Did they define those with any further specificity or did they leave it at that?

A They used their own terms, but they didn't give me, like, details.

Q Okay. Do you remember what terms they used?

A I do not.

MR. O'NEAL: All right. That's all I have.

MR. SWANSON: Anything?

MS. HOYING: I think that's it.

MR. SWANSON: Cool.

THE VIDEOGRAPHER: All right. This concludes the deposition. We are off the --

MS. HOYING: Oh, yeah. We can go off the video.

THE VIDEOGRAPHER: We're off the video record at 1:35 p.m.

MS. HOYING: Agent Rives, if you would like to, you have the opportunity to receive a printed copy of your transcript, and read it, and make sure your testimony has been taken down accurately, or you can waive -- to make any changes if you need to, or you can waive that right. Up to you.

THE WITNESS: I guess I would like to receive it.